*447
 
 Ruffin, C. J.
 

 By several acts of the General Assembly, prior to the year 1823, the' Gape Fear Navigation Company was incorporated for the purpose of improving the navigation of the Cape Fear River. Its capital stock was created by subscriptions by the State and individuals, and was divided into shares of §100 each, and the capital had been subscribed and all expended in works on the river, which, though they had improved the navigation to a considerable extent, yet left it imperfect in many places, so much so, that the tolls paid but small dividends to the stock-holders, and the value of the stock in the market fell one-half or more. In that state of things, the company applied to the Legislature for assistance by a further advance of money, to be applied to-the improvement of the navigation, and thereupon the act of 1823, 2 Rev. St. 272, was passed. That act directs, that for the purpose of completing the navigation of the river Cape Fear from the town of Wilmington upwards, the President and Directors of the Board of internal Improvements should, on behalf of the State, subscribe to the stock of this company the sum of §25,000, to be paid in instal-ments, not exceeding §10,000 in any one year, out of the fund set apart for Internal Improvements; But the subscription was to be made on certain conditions, as follows ;
 
 First,
 
 that,-before it should be made, the stockholders should, within a certain time, give their assent to a reduction'of the capital stock from its nominal amount of §100 to the share,
 
 to [a
 
 sum-to be fixed by them, .not exceeding §50 to the share. Secondly,- that the stock, which the State then owned in the company, should be reduced in the proportion of the stock of individuals, that the property then belonging to the company, and the subscription thereby authorized, should, respectively, constitute parts of the capital stock of the company, and the State should have, and own as many shares as the subscription there authorized should amount to, according to such reduced capital.
 
 Thirdly,
 
 that’ the President and Directors of the Company should consent in writing, that the Board of Internal Improvements should have the sole and- exclusive direction of the operation of the
 
 *448
 
 works, the making of contracts for the same, and all the improvements to bo made on the river. Then are added these words: “The improvements in the navigation shall commence at Wilmington, and regularly proceed up the river, as far as tile capital stock of the company- shall admit.”— jn ]g24; the stockholders assented to the act, and sunk the stock one half by reducing the share of stock from $>100, to $50, and the President and Directors gave their consent in writing, as required in the act. Thereupon, the Board of Internal Improvement's subscribed, on behalf of the State, for five hundred shares of the reduced stock, amounting in value to $25,000, and proceeded soon after-wards to expend for work on the river between Wilmihgton and Fayetteville, the sum of $12,143 13, to which expenditures no objection is raised by the President and Directors of the Navigation Company; When the subscription was made, no certificate of stock was issued to the State, nor any evidence given of the stock to which the State became entitled thereby, except the books of the company themselves. But for some years the Slate was treated as a corporation in the premises, and dividends declared and'paid into the Public Treasury as upon the -500 shares of stock thus subscribed. At the passing of the act of 1823, the Board of Internal Improvements was organized under the act of 1819, c. 2,- and consisted of the Governor, as president ex officio, and six commissioners to be chosen annually
 
 by the
 
 Legislature, one from each of the then judicial circuits. It was constituted a corporation, for the purpose of preserving and improving the fund for internal improvement thereby created, and disbursing such portions thereof as the Legislature might from time to time direct to be applied to any such-purpose, and bad authority to appoint a principal and assistant engineers, as, in their opinion, the public service might require, who should direct and superintend all the public works, which the assembly had or should authorize, and should receive such compensation as' the board might allow, to be paid out of the revenue of the fund for internal improvements when-adequate thereto. In 1831, by an act,
 
 *449
 
 cb. 21 ,• it was provided, that thereafter the said board and corporation should consist of the Governor for the time being, the Public Treasurer, and one other person to be chosen annually by the Legislature, and this last -named person, whom the act calls superintendent, was required to investigate the condition of all the incorporated navigation companies, and the liability to. the State of each, in which the State.was a stockholder, and the board was to represent t-hs' State at meetings of the stockholders in all such companies.
 

 In 1831, the residue of the State’s- said-subscription, name-' ]y, the sum of $12,856 87, not having-been expended or called for by the company, remained in the Public Treasury. In April, 1833,-the president and directors of the navigation company communicated to-the board of- internal improvements a resolution passed by them, that, in their opinion, the interest of the Company required that the residue of that fund should be-expended on the river below Fayette-ville, and requested the attendance of the superintendent attire next general meeting of the stockholders on the first of’ June following, and pointed out certain- improvements be-' low Fayetteville, which they desired to be made, and requested that one A. G. Keen,- who had been in the service of the company, should be employed to direct and carry them on, as he was an energetic man and a good practical; engineer’. The board- of internal improvements accordingly employed Mr. Keen as engineer to conduct the works.— But, being of opinion, that a competent navigation had been made between Wilmington and- Fayetteville, and that the interest of the company and the State required that the remaining fund should be laid out in works above Fayette-ville, or such part of it as might be necessary to effect certain improvements upon that part of the river, the board did not accord with the resolution of the president and directors, that the money ought to bespent-below, buhundertools and carried on the works above Fayetteville,, and expended in that'manner, as is alleged, the residue of the State’s subscription. In 1833, the board rendered to the company an account of those expenditures, to part whereof, viz, ths sum
 
 *450
 
 0f <$1375 53; t[ie company objected, because it was the salary of Keen and another engineer, which, it was insisted, was a charge that ought not to be thrown on the company, but should be defrayed by the State. The point of difference not being adjusted between the board of internal improve- ° , , , . . ments and the company, the latter withheld the dividends on the stock of the State, for the purpose of making that sum of $1375 53 whole to the company, and in 1837, the Legislature gave directions to the Attorney General to file an information against the company for settling the question. Accordingly the present information was filed, in which the various acts of incorporation and others amending them are set forth, and particularly that of 1823, and also the several proceedings hud under the same, as hereinbe-fore stated, and it prays, that the State may be declared to be a stockholder in the premises to the extent of 500 shares for the said subscription of «$25,000, as from the clay the same was made, and that a certificate or proper evidence of stock may be issued to her therefor, and that the dividends declared to her, and not paid to her, or that ought to have been declared, in respect to the said stock, and have not been, but have been withheld, be paid to the State by the said company. The answer of the company admits, that the certificate and dividends were withheld as alleged in the information, upon the ground, that the sum of $1375 53, for salaries to engineers ought not to
 
 be charged to the
 
 company, and it insists still upon that objection. And, besides, while it admits, that at that time no other objection was made to those expenditures, and that the company offered to settle the accounts as stated by the board of internal improvements, if the State would pay that sum of $1375 53, out of her own funds, yet the answer now insists farther, that the whole expenditure above Fayetteville was improper and unlawful, and not binding on the company, and therefore ought not to be charged or allowed against the company. It states that the offer to settle on the part of the-company was made both in ignorance of its rights and by way of compromise, and, therefore, ought not to conclude the company, unless in
 
 *451
 
 fact and law that be the proper mode of settlement. That the charges were proper, that answer states, the company cannot admit, because the detailed accounts and the vouchers for the sums stated to have been paid, are in the possession of the board of internal improvements and have not been accessible to the company’s officers. But if those pay-meats were actually made, the answer states they ought not to be allowed in payment of the State’s stock, for the several reasons following. That it was greatly to the advantage of the company that the lower portion of the river, between Wilmington and Fayetteville, should be improved, so as to have an easy and safe navigation throughout the year, and that, until that was effected, none of the funds of the company should have been diverted therefrom or laid'out about FayettevilleThat the act of 1823 stipulates, and it was one of the terms on which the act was accepted by the company, that the navigation should be completed .from Wilmington upwards, by commencing the improvements at Wilmington, and regularly proceeding up the river, as far as the capital would admit: That the navigation between Wilmington and Fayetteville was not completed, but might in many places have been yet further improved, and that the whole sum of $25,000, might judiciously have been expended below, and that therefore none of it should have
 
 been
 
 expended above Fayetteville: That in 1823, there were competent engineers appointed by the board of internal improvements and in the public service, whose duty it was to superintend these improvements, and upon whose agency and assistance, in advising, laying out, and directing the operations on the river, the company relied,when it agreed that the board of internal improvements should have the exclm sive direction of the works: That, before 1831, the public engineers had been discharged and the board had no skilful assistant, and in the operations of 1832, above Fayetteville, that the board disregarded the plans and recommendations, which had been proposed by an able civil engineer, and employed as their agent A. G. Keen, who was an uninstructed and unpractised engineer, and expended the large sums be
 
 *452
 
 fore mentioned without effecting any useful end, and to the injury of works previously erected: And finally, that against the expenditures above Fayetteville for any purpose, aud especially against those actually made and against the employment of Keen as agent, the president and directors contended and protested, before the expenditures were incurred. The answer further insists, that the State’s subscription was payable within two and an half years after it was made, and that for such parts as were not thus paid, interest may be charged as a just set off against the dividends .claimed. As the amount of expenditures above Fayetteville, though not denied, are not admitted in the answer, the cause necessarily goes before the master for an enquiry on that head. But as there can be hardly a doubt that the accounts ¿rendered by this public board were right, so far as to be founded on actual expenditures, and the navigation company is not disposed-to contest that point, -the' cause has been argued on the-latter paints, with the view of obtaining instructions to the master as to the principles of taking the accounts, or probably to enable the officers o-f the State and company to terminate the controversy without going beiorc the master. In the argument, those questions above were discussed, which are raised in the answer, .and upon each of them the opinion of the court-is in fa-vor of the State.
 

 Upon the original matter of difference, that is to say, to .which of the parties the salaries of engineers and agents, .employed in laying out or conducting the works, should be charged, the court entertains no doubt. Like every other disbursement out of the subscription of $25,000, before the money was actually paid into the treasury of the company, it was, in the first instance, to -be defrayed by the State, and then allowed as a credit in account with the company in part payment of the subscription.
 

 The argument for the defendant, indeed, was not placed on any express provision of the act of 1823. But inasmuch as that act puts the work under .the direction of the board of internal improvements, and inasmuch as the act of 1819 gives the board the power of appointing engineers, whose
 
 *453
 
 duty it was to superintend all the public works, and, inas much as the compensation of those persons was to be paid out of a public fund, it was inferred.-that.engineers employ- , _ . ,. , ... : , ed by the Board upon this work, were to be paid out of that fund also. But the court cannot yield to that interpretation of either of -those acts. By the act of 1819, the Legislature did not mean to provide an engineer for ev.ery navigation, canal, or turnpike company, and relieve them from all.or any expense-in .procuring the services of such a person— The language of -the act limits its operations to
 
 public
 
 works, that is, to such as had been or might be authorized by the Legislature for and on account of the State. We know that about .that -period many experimental surveys-were directed, so many and so extensive as to occupy the engineers employed for a long time. We believe .it true, that at the solicitations of companies and of their respective local engineers, the Board oí Internal Improvements often sent their engineers to view or review particular works or parts of works.' But the State’s engineer acted in such cases, only as a consulting engineer, and for the greater satisfaction of the company and its immediate officers, and without authority to director control. And we believe, -too, that those services were gratuitously rendered or not, according to the importance attached to the work by the Board, as one of public utility', and, if not gratuitous, they were compensated as might be stipulated in each case between .the company and the board. It certainly was never thought, that the public had undertaken to superintend all the enterprises of the numerous companies formed to effect some work of this character. Each company was left to its own direction, and to select engineers and agents for itself, and to choose between ■their plans, and they cannot, therefore, lay -to the fState the failure of their undertakings. The salary of the engineers employed in the case before us is as proper a charge against the company as the wages of any hireling or day-laborers employed under him.
 

 Upon the next point, we do not stop to enquire into the purpose or .conditions of the offer of the company to allow all
 
 *454
 
 the expenditures, except the engineer’s salary, as concluding the company, because, in the opinion of the court, the ob-jeetions to the expenditures are untenable, and
 
 the
 
 State is entitled to credit for them, such as may appear to have been made, independent of any such consent of the company.— The franchise is granted to the company for the whole riv. er, to its.source, and the grant must be taken to have been founded upon considerations of general utility, as well as the emolument of the private adventurers. It is obvious, 'that the public interest must be promoted by making a navigation as high up the river as possible, at least as high as would, upon the whole river, return tolls that would adequately remunerate for the outlay. And it is also obvious, that there might be a difference of opinion, probably founded on a difference of interests, between the community and the stockholders, as to the point up the river, to which the improvements should be carried, inasmuch as the difficulties of the improvements increase, and the profits to be derived from those particular improvements decrease with the ascent up the stream. Indeed as works of this character are generally of peculiar interest to .persons residing on the projected line of navigation, the stock is often taken for the most part by those who are thus interested, among whom there may be a similar contrariety of views, or their interests may lie higher or lower on the stream. When, therefore, in this case, there were works, taking Fayetteville as the mean point, above and below, in an unfinished condition after the expenditure of a large capital;, and application was made to the Legislature to enable the company to complete those works by the further subscription of capital, it cannot surprise, if that body should take the occasion to promote that interest, which is peculiarly public, as far as might be compatible with justice to the private stockholders; and to provide as far as possible against the waste of the funds either by extravagance of expenditure or losses through undertakings injudiciously begun without funds for théir completion ; and to those ends, should consent to subscribe, only on condition, tfeat the money should be laid out, either in
 
 *455
 
 a manner specially set forth in the act, or generally under the directions of the Legislature or other agents of the State, Such appear to have been the motives for the act of 1823. , 1 r . . . . „ . , , and such, U seems to ns, are its provisions. By it, the sole and exclusive direction, as to the improvements to be made, and the contracts for effecting them, is conferred on the Board of Internal Improvements, and that merely by force of the enacting words ; but, to render it yet more exclusive of the interference of the officers of the company, the latter are required to renounce in writing any powers upon those points. But it is said, that the' act itself confines the Board to a particular method of working, by requiring the improvements to
 
 commence,
 
 at Wilmington, and
 
 regularly proceed up Ihe river,
 
 and that no money ought to be laid out above, until the navigation be
 
 completed
 
 below; and that here the river is yet susceptible of improvement below Fayetteville. If the act gave any specifications of the improvements, which the Legislature contemplated,- as completing the navigation, if it referred to any surveys or plans as guides to the Board to which the execution was confided, we should hold that a departure therefrom was injurious to the company. But there are no such specifications or references, but only a general
 
 direction
 
 that the Board should begin at Wilmington. It is, necessarily, then left to the judgment and discretion of the Board, what improvements were necessary at the different points below, and to what extent they must be carried, to-be complete, before the field of operation
 
 above
 
 was entered upon. It was considered safe to leave this discretion to the Board. It must necessarily reside somewhere. It had before been in the officers of the company, under the supervision of the stockholders ; but had been transferred by them to the agents of the State. It is absurd to understand that the works were to be completed below in the sense that they should
 
 bq perfect,
 
 before there should be any progress up the river. We understand the provision as directory to the Board to finish what it might deem it necessary to begin' lower down, before any thing above was undertaken. In other words, the work and mode of conducting it, as it had
 
 *456
 
 before been in the discretion of the Director's of the corpora-^on) was then to be in the discretion of the Board of Internal Improvements, actingon behalf of the public, subject only to the general direction to-' commenee'below. If that Board should abuse its powers injudiciously, or wantonly, orcor-ruplly, it was open to the company to‘apply tothe Legislature to restrain or'remove them, reverse their decisions, or afford any other measure of redress. For, in truth, the Board is a mere political agent,-the creature of the Legislature, and subject in-all points to its-control, and confiding this matter to the discretion of that body was much the same, only more convenient'as retaining i-t in the discretion of the Legislature itself. Upon the last point, the general rule is. that the State never pays interest, unless she expressly engages to do so. But it does not, in this case, appear that the money was due, or, consequently, that interest could accrue. By the subscription the State became a stockholder, inasmuch as no other period is fixed for her becoming so. It is not stated when the money was payable, according to the actual le'rms' of subscription, and it is probable, there were no instalments designated otherwise than is mentioned in the act. According to that, the money was to be paid in sums-*1
 
 not exceeding
 
 $10,000 in any one year.’’ Now, as this money was to be laid out on the river, and could-not be applied to any other use, and as it was to be laid out under the direction and in the discretion of the Board of Internal Improvements, it would seenf naturally to follow, that-it should be paid by that at such times and for such-purposes as to the Beard itself seemed meet, with the limitation that not more than certain instalments should be paid. As a bargain, this would- seem a hard one, with the advantage greatly preponderating oirone side, and so it would be, were the parties private persons only; But it is to be remembered, that the State is the contracting party, and the-Board of Works an impartial arbiter, having no interest except so far as the members were citizens, and, at all events; that if the Board erred, the Legislature would always be ready, to correct the error, and do-justice to the citizen. Had
 
 *457
 
 the Board unreasonably delayed the work', or withheld the payment of the subscription, that the proper measure of redress would, upon application of the company, have been promptly supplied, cannot be doubted. But the company canot assume the power of self-redress, by withholding the State’s d-ividends for a supposed and independent demand a-gainstjier, not acknowledged by her, and not'provided for by an appropriation. But here it does not, in truth, appear that the company applied to the Board, even,.for an earlier expenditure or payment of the money, much less, that such an application was made known to the Legislature, and, certainly, the State cannot be charged with interest not promised, before a specific demand. Having thus disposed of the questions made in the pleadings and at the bar, the court has only to say farther, that if the defendant wishes the en-quiry, as to the sums actually laid out by the Board, it must be ordered, with instructions in conformity with the opinions-here given.
 

 Per Curiam. Decreed accordingly.