# UNITED STATES ET AL. *v.* TEXAS ET AL.

No. 91–1729.   Argued March 1, 1993—Decided April 5, 1993

REHNQUIST, C. J., delivered the opinion of the Court, in which WHITE, BLACKMUN, O'CONNOR, SCALIA, KENNEDY, SOUTER, and THOMAS, JJ., joined. STEVENS, J., filed a dissenting opinion, *post,* p. 539.

*Thomas G. Hungar* argued the cause for petitioners. With him on the briefs were *Solicitor General Starr, Acting Solicitor General Bryson, Assistant Attorney General Gerson, Deputy Solicitor General Roberts, William Kanter,* and *Bruce G. Forrest.*

*James C. Todd* argued the cause for respondents. With him on the brief were *Dan Morales,* Attorney General of Texas, *Will Pryor,* First Assistant Attorney General, *Mary F. Keller,* Deputy Attorney General, *Edwin N. Horne* and *Christopher Johnsen,* Assistant Attorneys General, and *Jorge Vega.*

CHIEF JUSTICE REHNQUIST delivered the opinion of the Court.

In this case we decide the question left open in *West Virginia* v. *United States,* 479 U. S. 305, 312–313, n. 5 (1987): whether Congress intended the Debt Collection Act of 1982 to abrogate the United States' federal common-law right to collect prejudgment interest on debts owed to it by the States. We hold that it did not.

Texas incurred the instant debts as a result of participation in the Food Stamp Program, 78 Stat. 703, as amended,

7 U. S. C. § 2011 *et seq.* Under that program, the Food and Nutrition Service (FNS) of the United States Department of Agriculture provides food stamp coupons to participating States, and the States then distribute the coupons to qualified individuals and households. §§ 2013(a), 2014. Regulations implementing the Food Stamp Program permit participating States to distribute the coupons either over the counter or through the mail. 7 CFR § 274.3(a) (1986); 7 CFR § 274.3(a)(3) (1992). While mail issuance generally is cheaper and more convenient, States that choose to use that distribution method must reimburse the Federal Government for a portion of the replacement cost for any lost or stolen coupons. 7 U. S. C. § 2016(f). Specifically, a State must reimburse the Government for all such losses above a "tolerance level" set by regulation.[1]

Texas, through its Department of Human Services, contractually bound itself to comply with all federal regulations governing the program. See 7 CFR §§ 272.2(a)(2), 272.2(b)(1) (1986).[2] Texas incurred substantial mail issuance

---

[1] The regulatory tolerance level in place for the mail issuance losses in this case was 0.5% of each reporting area's total mail issuances for each calendar quarter. 7 CFR § 274.3(c)(4)(i) (1986).

[2] Title 7 CFR § 272.2(a)(2) (1992) provides in pertinent part:

"The basic components of the State Plan of Operation are the Federal/State Agreement, the Budget Projection Statement, and the Program Activity Statement. . . . The Federal/State Agreement is the legal agreement between the State and the Department of Agriculture. This Agreement is the means by which the State elects to operate the Food Stamp Program and to administer the program in accordance with the Food Stamp Act of 1977, as amended, regulations issued pursuant to the Act and the FNS-approved State Plan of Operations."

Subsection (b)(1) sets out the exact wording of the preprinted Federal/State Agreement. The provisions relevant to this dispute are as follows:

"The State of —— and the Food and Nutrition Service (FNS), U. S. Department of Agriculture (USDA), hereby agree to act in accordance with the provisions of the Food Stamp Act of 1977, as amended, implementing regulations and the FNS-approved State Plan of Operation. The State

losses, in part because United States Postal employees stole food stamps that had been mailed by the Texas Department of Human Services to qualified households. Because those losses exceeded the applicable tolerance level, Texas was bound to reimburse the Federal Government for the excess losses. The FNS notified Texas of its debt in the amount of $412,385, and informed it that prejudgment interest would begin to accrue on the balance unless payment was made within 30 days.

Texas sought administrative relief in the form of a waiver of liability. After the Food Stamp Appeals Board denied the requested relief, Texas sued the United States in the United States District Court for the Western District of Texas. In addition to challenging the Appeals Board's refusal to grant a waiver of liability, Texas argued that the Debt Collection Act precluded the imposition of prejudgment interest on any amount it owed the Federal Government. The District Court granted summary judgment in favor of the United States on both issues. With respect to the prejudgment interest issue, the District Court adopted the approach taken by the Court of Appeals for the Tenth Circuit in *Gallegos* v. *Lyng*, 891 F. 2d 788 (1989), which held that the Government's common-law right to prejudgment interest on debts owed to it by the States survived enactment of the Debt Collection Act. See Civ. Action Nos. A–87–CA–774, A–88–CA–820 (WD Tex., Nov. 13, 1990).

The Court of Appeals for the Fifth Circuit affirmed the District Court's decision concerning waiver, but reversed its

---

and FNS (USDA) further agree to fully comply with any changes in Federal law and regulations. This agreement may be modified with the mutual written consent of both parties.

.          .          .          .          .

"The State agrees to: 1. Administer the program in accordance with the provisions contained in the Food Stamp Act of 1977, as amended, and in the manner prescribed by regulations issued pursuant to the Act; and to implement the FNS-approved State Plan of Operation." 7 CFR § 272.2(b)(1) (1992).

.

decision concerning prejudgment interest. 951 F. 2d 645 (1992). Relying on the language of the Debt Collection Act, the court held that the "Act is not silent concerning whether or not state obligations should be subject to prejudgment interest. The Act specifically excludes states from the payment of interest." *Id.*, at 651. Because Congress did not impose interest through the specific provisions of the Food Stamp Act "during the time period relevant in this case, the Courts are not free to 'supplement' Congress' enactment." *Ibid.* (quoting *Mobil Oil Corp.* v. *Higginbotham*, 436 U. S. 618, 625 (1978)). The court rejected the argument that abrogation is inconsistent with the Act's purpose of enhancing the Government's ability to collect its debts. In the court's view, the Federal Government could enforce its claims for unpaid mail issuance losses through the offset procedures built into the Food Stamp Act. Because of a split among the Courts of Appeals on this question, we granted certiorari, 506 U. S. 813 (1992), and now reverse.[3]

It is a "longstanding rule that parties owing debts to the Federal Government must pay prejudgment interest where the underlying claim is a contractual obligation to pay money." *West Virginia* v. *United States*, 479 U. S., at 310 (citing *Royal Indemnity Co.* v. *United States*, 313 U. S. 289, 295–297 (1941)). In *Board of Comm'rs of Jackson County* v. *United States*, 308 U. S. 343 (1939), we held that this common-law right extends to debts owed by state and local governments, but cautioned that a federal court considering the question in an individual case should weigh the federal and state interests involved. We reaffirmed *Board of*

---

[3] The Tenth Circuit holds that the Debt Collection Act of 1982 did not abrogate the Federal Government's common-law right to collect prejudgment interest against the States. *Gallegos* v. *Lyng*, 891 F. 2d 788 (1989). The Second, Third, and Eighth Circuits all hold to the contrary. See *Perales* v. *United States*, 751 F. 2d 95 (CA2 1984) *(per curiam); Pennsylvania Dept. of Public Welfare* v. *United States*, 781 F. 2d 334 (CA3 1986); *Arkansas by Scott* v. *Block*, 825 F. 2d 1254 (CA8 1987).

*Comm'rs* in *West Virginia, supra,* and upheld the assessment of prejudgment interest on a debt owed by West Virginia to the United States.

Just as longstanding is the principle that "[s]tatutes which invade the common law . . . are to be read with a presumption favoring the retention of long-established and familiar principles, except when a statutory purpose to the contrary is evident." *Isbrandtsen Co.* v. *Johnson,* 343 U. S. 779, 783 (1952); *Astoria Federal Savings & Loan Assn.* v. *Solimino,* 501 U. S. 104, 108 (1991). In such cases, Congress does not write upon a clean slate. *Astoria, supra,* at 108. In order to abrogate a common-law principle, the statute must "speak directly" to the question addressed by the common law. *Mobil Oil Corp.* v. *Higginbotham, supra,* at 625; *Milwaukee* v. *Illinois,* 451 U. S. 304, 315 (1981).

Texas argues that this presumption favoring retention of existing law is appropriate only with respect to state common law or federal maritime law. Although a different standard applies when analyzing the effect of federal legislation on state law, *id.,* at 316–317, there is no support in our cases for the proposition that the presumption has no application to federal common law, or for a distinction between general federal common law and federal maritime law in this regard. We agree with Texas that Congress need not "affirmatively proscribe" the common-law doctrine at issue. Brief for Respondents 3–4; see *Milwaukee, supra,* at 315. But as we stated in *Astoria, supra,* "courts may take it as a given that Congress has legislated with an expectation that the [common law] principle will apply except 'when a statutory purpose to the contrary is evident.'" 501 U. S., at 108 (quoting *Isbrandtsen, supra,* at 783).

The Debt Collection Act does not speak directly to the Federal Government's right to collect prejudgment interest on debts owed to it by the States. The Act states that "[t]he head of an executive or legislative agency shall charge a minimum annual rate of interest on an outstanding debt on a

United States Government claim owed by a *person* . . . ." 31 U. S. C. § 3717(a)(1) (emphasis added). Section 3701, in turn, provides that the term " 'person' does not include an agency of the United States Government, of a State government, or of a unit of general local government." § 3701(c). Texas argues that this exemption clearly establishes Congress' intent to relieve the States of their common-law obligation to pay prejudgment interest. We disagree.

The only obligation from which § 3701 exempts the States is the obligation to pay prejudgment interest in accordance with the mandatory provisions of the Act. These impose a stringent minimum interest requirement upon private persons owing money to the Federal Government. The statute is silent as to the obligation of the States to pay prejudgment interest on such debts. We agree with the Solicitor General that "Congress's mere refusal to legislate with respect to the prejudgment-interest obligations of state and local governments falls far short of an expression of legislative intent to supplant the existing common law in that area." Brief for Petitioners 16.[4]

---

[4] Both Texas and the Court of Appeals rely on Congress' authority to impose interest obligations on the States through specific statutes, such as the Medicaid Act, 42 U. S. C. § 1396b(d)(5), and the Social Security Act, 42 U. S. C. § 418(j) (1982 ed.), to support the proposition that the Debt Collection Act extinguished the Federal Government's common-law right to collect prejudgment interest. Both statutes, however, codified and made mandatory the common-law right to collect prejudgment interest at a specified interest rate. Like the Debt Collection Act, these statutes changed the common law. Congress' obvious desire to enhance the common law in specific, well-defined situations does not signal its desire to extinguish the common law in other situations.

Texas also relies on the recent amendment to 7 U. S. C. § 2022 adding a provision requiring prejudgment interest on specific obligations arising under the Food Stamp Act of 1977. Pub. L. 100–435, § 602, 102 Stat. 1674 (1988). But "subsequent legislative history is a 'hazardous basis for inferring the intent of an earlier' Congress." *Pension Benefit Guaranty Corporation* v. *LTV Corp.*, 496 U. S. 633, 650 (1990) (quoting *United States* v. *Price*, 361 U. S. 304, 313 (1960)). Texas' argument also fails because, like

Our conclusion that the States remain subject to common-law prejudgment interest liability is supported by the fact that the Debt Collection Act is more onerous than the common law.   Section 3717(a) *requires* federal agencies to collect prejudgment interest against persons and specifies the interest rate.[5]   The duty to pay prejudgment interest under the common law, however, is by no means automatic.   Before imposing prejudgment interest, the courts must weigh the competing federal and state interests.   *West Virginia*, 479 U. S., at 309–311; *Board of Comm'rs*, 308 U. S., at 350.   And instead of imposing a preestablished rate of interest, the district courts retain discretion to choose the appropriate rate in a given case.   Unlike the common law, § 3717 also imposes processing fees and penalty charges, 31 U. S. C. §§ 3717(e)(1), (e)(2).   Given these differences, it is logical to conclude that the Act was intended to reach only one subset of potential debtors—persons—and to leave the other subset alone.   It is reasonable to apply more stringent requirements to debts owed by private persons and to keep the more flexible common law in place for debts owed by state and local governments.

The evident purpose of the Debt Collection Act reinforces our reading of the plain language.   The Act was designed "[t]o increase the efficiency of Government-wide efforts to collect debts owed the United States and to provide additional procedures for the collection of debts owed the United States."   96 Stat. 1749; S. Rep. No. 97–378, p. 2 (1982) (the Act responded to "increasing concern . . . expressed in Con-

---

the Medicaid Act and the Social Security Act provisions, the Food Stamp Act of 1977 did not merely codify the common law without change. Rather, it contains a mandatory provision requiring prejudgment interest at a specified rate.

[5] The interest rate required under § 3717 is "the average investment rate for the Treasury tax and loan accounts for the 12-month period ending on September 30 of each year, rounded to the nearest whole percentage point."   31 U. S. C. § 3717(a)(1).

gress and elsewhere over the increasing backlog of unpaid debts owed the federal government"). This suggests that Congress passed the Act in order to strengthen the Government's hand in collecting its debts. Yet under the reading proposed by Texas and the Court of Appeals, the Act would have the anomalous effect of placing delinquent States in a position where they had less incentive to pay their debts to the Federal Government than they had prior to its passage.

The Court of Appeals reasoned that the States would not have an incentive to delay payment of their debts because the Food Stamp Act makes state agencies liable for actual losses caused by coupon shortages or unauthorized issuances, and permits the Federal Government to recover these debts through an administrative offset procedure. 951 F. 2d, at 650. But the Debt Collection Act applies to *all* federal agencies, not just the FNS. Thus, the existence of a mechanism in the Food Stamp Act allowing the FNS to collect its debts does nothing to encourage prompt payment of debts governmentwide. That the FNS may have already possessed adequate sanctions to compel payment is not a reason to conclude that the generic language in the Debt Collection Act was meant to abrogate the existing common-law obligation of the States generally.

Texas concedes that Congress intended to enhance the Government's debt collection efforts by passing the Act. It argues, however, that Congress was concerned primarily with debts owed by private persons. Accordingly, runs the argument, Congress meant to relieve the States of their duty to pay interest because the States were not the root of the debt collection problem.

Part of this argument persuades; Congress in the Act tightened the screws, so to speak, on the prejudgment interest obligations of private debtors to the Government, and not on the States. It may be inferred from this fact that the former were the root of the Government's debt collection problems which inspired the Act. But it does not at all fol-

low that because Congress did not tighten the screws on the States, it therefore intended that the screws be entirely removed. The more logical conclusion is that it left the screws in place, untightened.

As a last-ditch argument, Texas contends that its liability for losses in the mail is not a contractual debt for which it owes prejudgment interest, but rather a penalty unilaterally imposed by Congress. See *Rodgers* v. *United States,* 332 U. S. 371, 374–376 (1947) (penalties are not normally subject to prejudgment interest). This argument fails because the obligation of Texas to reimburse the Government for a portion of the stamps lost in the mail is quite different from that involved in *Rodgers.* There the penalties in question were unilaterally imposed by the Agricultural Adjustment Act on farmers who exceeded their production quotas; there was no suggestion that the farmers ever consented to such penalties. Here, on the other hand, Texas signed a Federal/State Agreement, the express terms of which bound the State to act in accordance with the implementing regulations. 7 CFR § 272.2(a)(2) (1986); see also n. 2, *supra.* Thus, 7 CFR § 274.3(c)(4) (1986), which imposed liability for mail issuance losses above a specified tolerance level, was incorporated into Texas' Federal/State Agreement. The requirement that the States reimburse the Federal Government for a certain portion of mail issuance losses is not a penalty, but a contractual obligation which the State assumed.[6]

---

[6] Both Texas and the Court of Appeals rely upon our decision in *Pennhurst State School and Hospital* v. *Halderman,* 451 U. S. 1 (1981), for the proposition that the Federal Government may not collect prejudgment interest because neither the Debt Collection Act nor the Food Stamp Act expressly require prejudgment interest. This reliance is misplaced. In *Pennhurst,* we held that in order to impose conditions on the receipt of federal funds, Congress must speak unambiguously. *Id.,* at 17. This makes sense because the States cannot voluntarily and knowingly agree to a condition that is not clearly expressed. *Ibid.* Because the duty to pay prejudgment interest on debts owed to the United States existed long before either the Food Stamp Program or the Debt Collection Act was

For these reasons, we hold that the Debt Collection Act left in place the federal common law governing the obligation of the States to pay prejudgment interest on debts owed to the Federal Government.

The judgment of the Court of Appeals to the contrary is accordingly

*Reversed.*

JUSTICE STEVENS, dissenting.

As the Court correctly notes, the requirement that private parties must pay prejudgment interest on contractual debts owed to the United States is a common-law rule of long standing. *Ante,* at 533. Over a century ago we recognized an equally well-established exception to that rule: The United States is not entitled to recover interest from a State unless the State's consent to pay such interest has been expressed in a statute or binding contract. *United States* v. *North Carolina,* 136 U. S. 211 (1890).[1] The reason for this exception is not any sovereign immunity attributable to a State,[2] but the venerable presumption that a sovereign State is always ready, willing, and able to discharge its obligations promptly.[3]

---

created, the rule in *Pennhurst* does not apply. See *Bell* v. *New Jersey,* 461 U. S. 773, 790, n. 17 (1983).

[1] "Interest, when not stipulated for by contract, or authorized by statute, is allowed by the courts as damages for the detention of money or of property, or of compensation, to which the plaintiff is entitled; and, as has been settled on grounds of public convenience, is not to be awarded against a sovereign government, unless its consent to pay interest has been manifested by an act of its legislature, or by a lawful contract of its executive officers. *United States* v. *Sherman,* 98 U. S. 565; *Angarica* v. *Bayard,* 127 U. S. 251, 260, and authorities there collected; *In re Gosman,* 17 Ch. D. 771." *United States* v. *North Carolina,* 136 U. S., at 216.

[2] The individual States retain no sovereign immunity against the Federal Government. *United States* v. *Texas,* 143 U. S. 621 (1892).

[3] "Judgments, it is true, are by the law of South Carolina, as well as by Federal legislation, declared to bear interest. Such legislation, however, has no application to the government. And the interest is no part of the

The presumption that a sovereign State is "always ready to pay what it owes"[4] may well have been just as fictional as the presumption that the King could do no wrong, but it nevertheless was firmly embedded in the common law.[5] Moreover, even today the tradition of according special respect to a sovereign State whenever it is subjected to the coercive powers of judicial tribunals is very much alive. See, *e. g., Puerto Rico Aqueduct and Sewer Authority* v. *Metcalf & Eddy, Inc.*, 506 U. S. 139, 146 (1993). The ancient common-law presumption and a continuing recognition of "the importance of ensuring that the State's dignitary interests can be fully vindicated," *ibid.*, best explain why Congress deliberately omitted any provision for the collection of interest from a sovereign State when it enacted the Debt Collection Act in 1982.[6]

The Court is also correct in noting that we are reluctant to infer a legislative abrogation of the common law. *Ante,* at 534. We presume that Congress understands the legal terrain in which it operates, see *Cannon* v. *University of Chicago*, 441 U. S. 677, 698–699 (1979), and we therefore

---

amount recovered. It accrues only after the recovery has been had. Moreover, whenever interest is allowed either by statute or by common law, except in cases where there has been a contract to pay interest, it is allowed for delay or default of the debtor. *But delay or default cannot be attributed to the government. It is presumed to be always ready to pay what it owes." United States* v. *Sherman,* 98 U. S. 565, 567–568 (1879) (emphasis added). See also *United States* v. *North American Transportation & Trading Co.,* 253 U. S. 330, 336 (1920).

[4] See n. 3, *supra.*

[5] See, *e. g., Attorney General* v. *Cape Fear Navigation Co.,* 37 N. C. 444, 454 (1843) ("[T]he general rule is, that the State never pays interest, unless she expressly engages to do so"); *State* v. *Thompson,* 10 Ark. 61 (1849).

[6] Title 31 U. S. C. §3717(a) requires the appropriate government official to charge interest "on an outstanding debt on a United States Government claim owed by a person," but 31 U. S. C. §3701(c) provides that for purposes of this section the term " 'person' does not include an agency of the United States Government, of a State government, or of a unit of general local government."

expect Congress to state clearly any intent to reshape that terrain. Before we can apply this reluctance to infer legislative abrogations of the common law, however, we must determine what that terrain was—or at least how it might have been perceived—when Congress acted; Congress cannot think it necessary, and we should not expect it, to state clearly an intent to abrogate a common-law rule that does not exist.

When Congress enacted the Debt Collection Act of 1982, the question whether interest might ever be collected from a sovereign State unless explicitly authorized was undecided by this Court. We had never held that the United States could demand prejudgment interest on a debt owed to it by a State. Not until five years later, in *West Virginia* v. *United States*, 479 U. S. 305 (1987), did we hold for the first time that in some circumstances the United States may demand prejudgment interest from the States themselves. The Court therefore rewrites the history of our common law when it predicates its entire analysis of this case on what it creatively describes as "the United States' federal common-law right to collect prejudgment interest on debts owed to it by the States." *Ante,* at 530. Only through hindsight— or by crediting Congress with a prescience as to what the common law *would become*—can the Court find that the 97th Congress did not intend to abrogate a rule that did not then exist.[7] Congress had every reason to think it was writing

---

[7] So long as we are going to credit the Congress with a *post hoc* understanding of the common law, we might as well refer to the *post hoc* comments of the author of the amendment, Senator Percy:

"Prior to September 27, 1982, neither Senate bill 1249 nor House bill 4613 contained a provision exempting any entity from the Act. Several interest groups, however, presented the view that sections 10 and 11 of the Act, except in cases where fraud was evident, should not be applied to states or local governments because they constituted a different class of debtor than did private individuals and would suffer great harm if the federal government attempted to assess interest or apply administrative offsets against them. These same concerns had been presented in hear-

on a "clean slate," *ante*, at 534, when it decided to exclude the State from its definition of the class of persons who must pay interest on debts to the United States. There was no occasion for Congress to specifically abrogate a principle that it had no reason to think stood in its way.

In *Board of Comm'rs of Jackson County* v. *United States*, 308 U. S. 343 (1939), the Court held that the United States, suing on behalf of a Native American, could *not* recover prejudgment interest from a county even though the county had improperly collected those taxes. While noting that "interest in inter-governmental litigation has no . . . roots in history," *id.*, at 351, the Court did not rule out the possibility that in an unusual case, considerations of fairness might make it appropriate to collect such interest from a state agency, see *id.*, at 352. Only to that small extent, therefore,

---

ings before the House Committee on the Judiciary during the House's consideration of the Debt Collection Act of 1981, H. R. 4614.

"In response to these concerns, on September 27, 1982, I proposed an amendment to S. 1249. This amendment, UP amendment 1299, amended provisions in Sections 10 and 11 of the Act, stating that 'the term "person" does not include any agency of the United States, or any state or local government.' This provision effectively took federal agencies, states and local governments out of the Act, but retained sufficient flexibility to permit Congress to legislatively pick and choose according to circumstances, those situations in which the government might assess interest against those entities exempted by the Act. As enacted, the Debt Collection Act of 1982 appears clear on this point. It was not anticipated that federal agencies would attempt to invoke common law authority, which, *if it exists with respect to interest assessment and administrative offset against states and local governments*, was abrogated by sections 10(e)(2) and 11(e)(8) of the Act." Letter of Nov. 21, 1983, from Senator Charles H. Percy to the Comptroller General (emphasis added). See *Texas* v. *United States*, 951 F. 2d 645, 649–650 (CA5 1992); *Pennsylvania Dept. of Public Welfare* v. *United States*, 781 F. 2d 334, 341, n. 10 (CA3 1986). Of course, the significance of a comment by an individual legislator is discounted when made " 'after passage of the Act,' " see *Bread Political Action Committee* v. *FEC*, 455 U. S. 577, 582, n. 3 (1982). This Court's use of the 1987 opinion in the *West Virginia* case to describe the state of the common law in 1982 should be similarly discounted.

was any aspect of our decision in *Board of Comm'rs* "reaffirmed," *ante,* at 533, in *West Virginia, supra.*

In fact, in *West Virginia,* we rejected the balancing of equities that *Board of Comm'rs* had suggested might be the only basis for charging a State with prejudgment interest.[8] There, the State of West Virginia had refused to reimburse the Federal Government for costs advanced to it under the Disaster Relief Act of 1970. The Court held that "any rule exempting a sovereign from the payment of prejudgment interest not only does not apply of its own force to the State's obligations to the Federal Government, cf. *Library of Congress* v. *Shaw,* 478 U. S. 310 (1986), but also does not represent a policy the federal courts are obliged to further." 479 U. S., at 311–312 (footnotes omitted). This was the first statement by this Court suggesting that the States might be generally liable for prejudgment interest on the contractual claims brought by the Federal Government. And, even though we came close to saying in *West Virginia* that such interest is generally available, we did not go that far. Even in 1987—five years after the Debt Collection Act was passed—it was not clear to us, to Congress, or to the States that the obligation of a State to pay prejudgment interest to the Government would extend to a typical contract claim.

Thus, even though the Court today suggests that its decision is merely an application of *Board of Comm'rs* and *West Virginia,* it actually takes a significant and independent step toward equating the Government's right to collect prejudgment interest from the States with the Government's right

---

[8] "The cases teach that interest is not recovered according to a rigid theory of compensation for money withheld, but is given in response to considerations of fairness. It is denied when its exaction would be inequitable. *United States* v. *Sanborn,* 135 U. S. 271, 281; *Billings* v. *United States,* 232 U. S. 261." *Board of Commr's of Jackson County* v. *United States,* 308 U. S. 343, 352 (1939). In 1987 the Court rejected the argument that "whether interest had to be paid depended on a balancing of equities between the parties." *West Virginia* v. *United States,* 479 U. S., at 311, n. 3.

to demand prejudgment interest from *all* private parties in *every* case.[9]   Even if such an equation were well advised, which it may well be, it would say nothing about whether Congress had any reason to know in 1982 that the common law was moving in that direction, much less that it had already arrived there.   Yet the Court supports today's decision because the 97th Congress did not clearly state its intention to abrogate a rule that we now make clear for the first time.

My point, in sum, is not that the States had an absolute common-law immunity from a claim for prejudgment interest in 1982; it is only that the State's *obligation* to pay such interest was so much *less than* a confirmed rule that we cannot say that the 1982 enactment "left [it] in place," *ante*, at 539.   "[F]avoring the retention of long-established and familiar principles," *Isbrandtsen Co.* v. *Johnson*, 343 U. S. 779, 783 (1952), does not mean favoring the retention of rules that have not yet fallen into place.

I respectfully dissent.

---

[9] Whatever it says about reserving discretion about when interest should be imposed, and at what rate, *ante*, at 536, the Court has tacitly authorized an extension of the rule on which we relied in *West Virginia* by affirming its application to a claim for prejudgment interest on a strict liability, loss-spreading provision of the Food Stamp Program.