HOWARD, Circuit Judge
(concurring).
Whether the Bureau of Prisons’ (“BOP”) policy ought to be sustained presents a difficult question. I join the court’s treatment of this question, and I write separately to emphasize a point that is the decisional fulcrum for me. Beyond this, I also include an observation on the scope of our holding.
*30 We are not presented with a pure question of statutory interpretation. Rather, we are required to decide whether BOP’s interpretation of the statute is a permissible reading of the text. See Reno v. Koray, 515 U.S. 50, 62, 115 S.Ct. 2021, 132 L.Ed.2d 46 (1995) (stating that BOP’s interpretation must be granted deference unless the “statute cannot bear” its interpretation). If we are unsure of the correct interpretation, we must defer to BOP’s reading. Id. at 61, 115 S.Ct. 2021. As explained in the lead opinion, the critical question is whether the phrase “the place of ... imprisonment”, as used in § 3621(b), can be read to exclude placement in a Community Correction Center (“CCC”). Ante at 26-27. Since 2002, BOP has interpreted the statute in this way. Id. at 19. Although I think that the question is close, I agree that BOP’s construction is, in the end, not adequately supported.
A common type of CCC is a “halfway house” which “provide[s] suitable residence, structured programs, job placement, and counseling, while the inmates’ activities are closely monitored.” See BOP Program Statement 7310.04 (1998). Prisoners residing at most CCCs are permitted to leave the facility for employment and certain other community activities. Id. If we were, as the government urges, to simply apply the common definition of “imprisonment” to decide whether it includes placement in a CCC, the statute would be ambiguous. Imprisonment can be defined as “constraint of a person either by force or by such other coercion as restrains him within his limits against his will.” Webster’s Third New Int’l Dictionary at 1137 (1993). Under BOP’s CCC program, prisoners are free to leave many CCC facilities for certain parts of the day but not at other times. Thus, whether prisoners residing in CCCs are “imprisoned” may conceivably be determined, as the lead opinion says, by whether one is in the custody of BOP, or may depend on the type of CCC involved, or may even arguably depend on the time of day at which the question is asked.[11]
The legislative history of § 3621(b) is also not conclusive. The predecessor version of § 3621(b) provided that prisoners could be assigned or transferred to CCCs. Congress explicitly granted authority to the Attorney General (and via him to BOP) to assign or transfer a prisoner to any “suitable ... facility” and defined facility to include “a residential community treatment center.” 18 U.S.C. § 4082 (replaced by 18 U.S.C. § 3621(b)); Pub.L. 89-176. See United States v. Tkabladze, No. 0301152, 2003 WL 22836502 at *3 (C.D.Cal. May 16, 2003) (stating that “residential community treatment center” is the old term for a CCC).
As part of the Sentencing Reform Act of 1984, Congress replaced § 4082 with § 3621(b).[12] The new provision changed the term “facility” to “penal or correctional facility” and deleted the “facility” definition which had expressly included CCCs. The deletion of § 4082’s “facility” defini *31 tion from § 3621(b) could suggest that Congress intended to redefine “facility” to exclude CCCs. See Taylor v. United States, 495 U.S. 575, 590, 110 S.Ct. 2143, 109 L.Ed.2d 607 (1990) (stating that the omission of a pre-existing definition often indicates that Congress rejected the definition).
On the other hand, the Senate Judiciary Committee Report accompanying the Sentencing Reform Act strongly suggests otherwise. See S.Rep. No. 225, reprinted in 1984 U.S.C.C.A.N. 3182, 3324. The report emphasized that § 3621(b) was intended to “follow existing law.” Id. Indeed, the report expressly stated that § 3621(b) continued BOP’s discretionary authority to designate a suitable place of confinement for each prisoner and that the proposed provision created only one new requirement (i.e., that BOP must assign prisoners to facilities that meet minimum health and habitability standards). Id. at. 3324-25. Thus, the report indicates that, after the enactment of § 3621(b), BOP retained its pre-existing authority to assign or transfer prisoners to CCCs at any time during their sentences.
The subsequent legislative history of § 3621(b), however, suggests the exact opposite interpretation. Congress reconsidered § 3621(b) as part of the debate over the Crime Control Act of 1990. The original version of this bill proposed amending § 3621(b) to grant BOP the authority to assign or transfer prisoners to any “suitable and appropriate institution, facility or program ....” H.R. 5269, 101st Cong. § 1404 (1990). According to the House Judiciary Committee Report accompanying H.R. 5269, under existing law, “[T]he Bureau of Prisons c[ould] only place an inmate in a Community Correction Center for up to six months or for the last 10 percent of his or her sentence, whichever is shorter.” H.Rep. 101-681, reprinted in 1990 U.S.C.C.A.N. 6472, 6546. The report proceeded to explain that § 1404 broadened BOP’s authority in this regard:
Section 1404 restores the Bureau of Prisons’ previously existing authority to designate an appropriate place for offenders to serve their sentences, including Community Correction Centers .... The Bureau of Prisons has developed highly controlled programs in the community that provide effective, punitive sanctions for certain non-violent offend- . ers who at some point in their prison sentence would not be appropriately incarcerated in a traditional prison setting .... New Federal drug and crime laws and Federal sentencing guidelines have resulted in a highly diverse prison population .... Section 1404 provides the Bureau of Prisons with the necessary flexibility to manage this increasingly diverse Federal inmate population.
1990 U.S.C.C.A.N at 6546. Thus, the authors of the 1990 Crime Control Act interpreted the existing version of § 3621(b) as denying BOP the ability to assign prisoners to CCCs, except during the final porT tion of their sentence.
Section 1404 was stricken from H.R. 5269 on the floor of the House of Representatives and did not become law. Representative McCollum, the sponsor of the amendment striking the section, explained that he opposed § 1404 because
'the language of the bill as it is now out here before us ... giv[es] a whole lot more authority to the Bureau .of Prisons than we really ought to .... The language in the bill, without being amended, would have effectively allowed the ... Bureau of Prisons to release any prisoner for any length of time ... so they would not have had to serve a day in prison.
136 Cong. Rec. 27587-88 (1990). The 1990 law, as enacted, left BOP’s authority to *32 assign and transfer prisoners unchanged. Presumably for at least some members of the 101st Congress, this meant that BOP could not assign or transfer prisoners to CCCs, except at the end of their terms.
This subsequent legislative history is, to say the least, troubling and hard to ignore. On the other hand, there is reason to heed the Supreme Court’s frequent admonition that using subsequent legislative history to interpret a statute is a hazardous endeavor. See, e.g., Doe v. Chao, 540 U.S. 614, 124 S.Ct. 1204, 1212, 157 L.Ed.2d 1122 (2004); Jones v. United States, 526 U.S. 227, 238, 119 S.Ct. 1215, 143 L.Ed.2d 311 (1999); United States v. Texas, 507 U.S. 529, 535 n. 4, 113 S.Ct. 1631, 123 L.Ed.2d 245 (1993); Pension Benefit Guaranty Corp. v. LTV Corp., 496 U.S. 633, 650, 110 S.Ct. 2668, 110 L.Ed.2d 579 (1990); but see Sullivan v. Finkelstein, 496 U.S. 617, 628-29 n. 8, 110 S.Ct. 2658, 110 L.Ed.2d 563 (1990); W. Eskridge & P. Frickey, Law as Equilibrium, 108 Harv. L.Rev. 26, 65 (1994) (stating that the Supreme Court’s stated doctrine of declining to rely on subsequent legislative history “cannot be taken at face value”). Were § 3621 (b)’s text ambiguous and the contemporaneous legislative history of § 3621(b)’s enactment un-illuminating, the legislative history of the 1990 Crime Control Act might well have persuaded me to conclude that BOP’s interpretation is entitled to deference. However, here, where the traditionally preferred methods of interpreting a statute through its plain language and the contemporaneous legislative history support the court’s conclusion, it is appropriate to look past this inconsistent subsequent history.
Ultimately, I am convinced that the plain meaning of the statute can be ascertained by applying the “fundamental principle of statutory construction ... that the meaning of a word (or phrase) cannot be determined in isolation, but must be drawn from the context in which it is used.” See Koray, 515 U.S. at 56, 115 S.Ct. 2021 (quoting Deal v. United States, 508 U.S. 129, 132, 113 S.Ct. 1993, 124 L.Ed.2d 44 (1993)). As the lead opinion explains, “the place of ... imprisonment” is a defined phrase when § 3621(b) is read as a whole. See ante at 25. The next sentence of the statute states that “the place of ... imprisonment” can be “any penal or correctional facility.” Id. This then is the definition of “the place of ... imprisonment.” Thus, whether “the place of ... imprisonment” includes placement in a CCC hinges on whether a CCC is a “penal or correctional facility.” Id. at 26.
The government does not dispute that a CCC is such a facility. See BOP Program Statement No. 7310.02 (1993) (stating that CCCs meet § 3621(b)’s definition of a “penal or correctional facility”); Office of the Legal Counsel, United States Department of Justice, Bureau of Prisons Practice of Placing in Community Confinement Certain Offenders Who Have Received Sentences of Imprisonment (Dec. 13, 2002) (assuming, arguendo, that CCC is a penal or correctional facility, but noting that a prior Office of the Legal Counsel opinion had not addressed whether a CCC is a “place of imprisonment”). Because BOP may assign a prisoner to “any penal or correctional” facility, the text, read as a whole, supports the court’s interpretation.
This conclusion is buoyed by § 3621(b)’s contemporaneous legislative history. There is evidence that § 3621(b) was not intended to make substantive changes in BOP’s pre-existing authority, including its authority to assign or transfer prisoners to CCCs. See supra at 30-31; see also Barden, 921 F.2d at 481. This history comports with the plain meaning of the statute as outlined in the lead opinion. Although the apparent change in the congressional *33 view of the scope of BOP’s authority between 1984 and 1990 remains unexplained, because the contemporaneous legislative history is compelling and that history supports the most plausible reading of the text, it ought to govern over contrary subsequent history. Thus, while the 1990 legislative history demonstrates the close question presented, it does not provide sufficient reason to cast doubt on the lead opinion’s conclusion.
But just because the BOP may assign prisoners to CCCs does not mean that it must do so. As our holding states, BOP is authorized to transfer prisoners to CCCs at any time during their prison terms. Ante at 24-25. Consistent with the question presented by this appeal, the lead opinion does not address whether § 3621(b) places any constraints on the manner in which BOP may choose to exercise its discretion to make CCC placements.
This limited holding is also consistent with the text of § 3621(b). BOP may designate “any penal or correctional facility.” 18 U.S.C. § 3621(b). In making assignments and transfers, Congress suggested that BOP consider several factors including the resources of the facility, the nature and circumstances of the offense, the history and characteristics of the prisoner, any recommendations by the sentencing court, and pertinent policy statements from the Sentencing Commission. Id. These factors are non-exclusive and do not bind or limit BOP’s exercise of its discretion. See Thye v. United States, 109 F.3d 127, 130 (2d Cir.1997) (“Decisions to place a convicted defendant within a particular treatment program or a particular facility are decisions within the sole discretion of the Bureau of Prisons.”); Falcon v. Knowles, 807 F.Supp. 1531, 1533 (S.D.Fla.1992) (”[A]ny approach that puts the judicial branch in charge of designating the place of confinement for a federal prisoner — no matter how well justified on utilitarian grounds— collides with ... [BOP’s] unfettered authority to decide where to house federal prisoners;); see also Cohen v. United States, 151 F.3d 1338, 1343-44 (11th Cir.1998) (discussing BOP’s wide discretion to assign prisoners to any correctional facility, despite statutory factors); Yi v. Federal Bureau of Prisons, No. 03-CV-1493, 2003 WL 21321411 at *2 (E.D.Pa.2003) (similar). The Senate report accompanying the Sentencing Reform Act confirms the wide scope of BOP’s discretion: “The Committee, by listing factors for [BOP] to consider in determining the appropriateness or suitability of any available facility, does not intend to restrict or limit [BOP] on the exercise of its existing discretion ....” 1984 U.S.C.C.A.N. 3325.[13] Thus, nothing in § 3621(b) requires BOP to give any particular level of consideration to an assignment or transfer request.
Even if the statutory criteria for making assignments and transfers could be read to guarantee some sort of individualized treatment, it is apparent to me that BOP would still have the authority to make a categorical rule excluding some or all CCC placements, except as required for end of sentence placements governed by § 3624(c).[14] The Supreme Court recently *34 affirmed BOP’s categorical rule making authority in a case concerning the permissibility of another BOP regulation. Lopez v. Davis, 531 U.S. 230, 243-44, 121 S.Ct. 714, 148 L.Ed.2d 635 (2001). “Even if a statutory scheme requires individualized determinations ... the decisionmaker has the authority to rely on rulemaking to resolve certain issues of general applicability unless Congress clearly expresses an intent to withhold that authority.” Id. (quoting Am. Hosp. Assn. v. NLRB, 499 U.S. 606, 612, 111 S.Ct. 1539, 113 L.Ed.2d 675 (1991)). BOP “is not required continually to revisit ‘issues that may be established fairly and efficiently in a single rulemaking proceeding.’ ” Id. (quoting Heckler v. Campbell, 461 U.S. 458, 467, 103 S.Ct. 1952, 76 L.Ed.2d 66 (1983)).

. Further confirming the difficulty of determining whether the plain meaning of "imprisonment” encompasses community confinement, courts addressing the question, in other areas of sentencing law, have offered conflicting views on the question. See Iacaboni v. United States, 251 F.Supp.2d 1015, 1030-35 (D.Mass.2003) (summarizing relevant case-law).

. The important change to existing law made by § 3621(b) is that it transferred the custody of prisoners from the Attorney General directly to BOP. Under § 4082, the Attorney General had custody of federal prisoners but delegated this authority to BOP in the first instance. See Barden v. Keohane, 921 F.2d 476, 481-82 (3d Cir.1990).

. Indeed, absent compelling circumstances, federal courts should not even review a BOP decision concerning a prisoner placement. 18 U.S.C.C.A.N. at 3325 (citing Darsey v. United States, 318 F.Supp. 1346 (W.D.Mo.1970)).

. The government contends that one reason that § 3621(b) should be interpreted to prohibit CCC placements is that the Sentencing Guidelines prohibit courts from granting CCC placements to individuals sentenced to terms of imprisonment. U.S.S.G. § 5C.1.1. It is, I agree, inappropriate for us to interpret the meaning of § 3621(b) to assure that it is con *34 sistent with subsequent rules promulgated by the Sentencing Commission. Ante at 23. But BOP may decide that, as a matter of sound policy, it should exercise its § 3621(b) discretion in harmony with the Guidelines and thus prohibit inconsistent CCC placements.