[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
AUGUST 16, 2005
THOMAS K. KAHN
CLERK

_____

No. 04-14410

_____

D. C. Docket No. 02-01024-CV-ORL-22KRS

SIEMENS POWER TRANSMISSION & DISTRIBUTION, INC.,

Plaintiff-Appellant,

versus

NORFOLK SOUTHERN RAILWAY COMPANY,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

**(August 16, 2005)**

Before EDMONDSON, Chief Judge, BIRCH and COX, Circuit Judges.

BIRCH, Circuit Judge:

This appeal presents two issues of first impression in our circuit:  (1)

whether a shipper's timely compliance with the minimum claim filing requirements in 49 C.F.R. § 1005.2(b), a regulation promulgated by the Interstate Commerce Commission ("ICC"), is a prerequisite to filing suit against a carrier under the Carmack Amendment, 49 U.S.C. § 14706;[1] and if so, (2) what standard should be applied to determine whether a shipper has adhered to the regulation's requirement that a claim contain "a specified or determinable" amount of damages, 49 C.F.R. § 1005.2(b). We hold that a shipper must file with the carrier a notice of a claim that satisfies § 1005.2(b) before filing suit under the Carmack Amendment. We also conclude, however, that § 1005.2(b) should be interpreted liberally in light of its purpose, which is to provide the carrier adequate notice of the claim so that it can conduct an independent investigation of the damage, not to relieve the carrier of liability.

Applying this standard here, we conclude that the notice of claim for damage caused to an electrical transformer shipped by rail, submitted by Siemens Power Transmission and Distribution, Inc. ("Siemens"), to Norfolk Southern Railroad ("NSR"), satisfies the minimum claim requirements of § 1005.2(b) as a matter of

---

[1] Effective 1 January 1996, Congress abolished the ICC and transferred most of its functions to the newly established Surface Transportation Board, an agency within the Department of Transportation. See ICC Termination Act of 1995, Pub. L. No. 104-88 §§ 1(a), 101, 701, 702, 109 Stat. 803 (1995). Because the regulations at issue in this case were promulgated while the ICC was still in existence, however, we refer to them throughout as the "ICC Regulations."

law.  We thus **REVERSE** and **REMAND** for proceedings consistent with this opinion.

## I.  BACKGROUND

In the Spring of 1999, Siemens entered into an agreement with Florida Power and Light Company ("FP&L") for the sale of an electrical transformer.  As part of the agreement, Siemens agreed to arrange and pay for the transportation and delivery of the transformer to FP&L's facility in Florida.

In order to carry out this obligation, Siemens retained a transportation consultant, Tranco, Inc. ("Tranco"), to arrange for shipment of the transformer from Norfolk, Virginia, to Florida.  Edward Henry, Tranco's president, acted as Siemens's agent for purposes of communicating with rail carriers.  In March 1999, Henry approached NSR about possibly shipping the transformer to Florida by rail.  Additionally, Siemens installed an electronic impact recorder to record any excessive shocks that might occur during transportation and cause damage to the transformer.

Shipped from Germany by ocean vessel, the transformer arrived in Norfolk, Virginia, on 15 January 2000.  On 17 January 2000, Henry issued NSR a Straight Bill of Lading ("the Bill of Lading").  The Bill of Lading incorporated by reference

3

the terms of the Uniform Straight Bill of Lading ("USBL").[2] Pursuant to the Bill of Lading, NSR undertook the carriage of the transformer to FP&L's facility in Florida. The transformer arrived at FP&L's facility on 28 January 2000.[3]

After the transformer arrived, the electronic impact recorder that had been installed in the transformer was retrieved and read. The recorder indicated that the transformer had been exposed to forces in excess of Siemens's established thresholds for safe carriage of the device. Additional tests revealed that the transformer was not operating properly and needed repair. According to Siemens, all of the forces that caused damage to the transformer had occurred while NSR had custody and control over the device.[4]

On 1 March 2000, Henry sent NSR a letter indicating Siemens's intent to claim the costs of the repair of the transformer:

---

[2] The Uniform Straight Bill of Lading provides, in relevant part:
> As a condition precedent to recovery, claims must be filed in writing with the . . . carrier . . . within nine months after delivery of the property . . . . Where claims are not filed . . . in accordance with the foregoing provisions, no carrier hereunder shall be liable, and such claims will not be paid.

R2-37, Ex. O § 2(b).

[3] NSR made arrangements with Florida East Coast Railroad ("FECR") to complete the last portion of the delivery. The transformer was interchanged to the FECR in Jacksonville, Florida.

[4] NSR maintains that the damaging "shocks were recorded at different times during the transportation of the transformer, both before, during, and after the time NSR was in possession of the transformer." R2-37 ¶ 11 at 3.

> Please accept this letter as our intent to file a claim for damage to an electrical transformer moving from the Port of Norfolk, VA to Titusville, FL on QTTX-131117, 1/21/00.
>
> The computerized impact recorder showed longitudinal impacts on 1/21/00 at 4.85, 5.95 and 4.37 G's. Time approximately 4:00 P.M. The load was in a train moving from Crew, VA to Linwood, NC.
>
> Upon an interior inspection damage was noted and Siemens technical engineers are evaluating the damage.
>
> At this time we cannot state a cost for repairs but will send you a report when available. Siemens estimated repairs at $25,000,00.

R2-51, Ex. 1. On 2 March 2000, Henry sent a fax to NSR "regarding [its] possible claim" and invited NSR to send a representative to an inspection of the transformer conducted by a Siemens team. Id., Ex. 3. According to Siemens, NSR neither responded to either communication nor sent a representative to the inspection.

After inspecting the transformer in Florida, Siemens decided to ship the transformer back to Germany for repairs. By letter dated 5 April 2000, Henry informed NSR that "[a]t this time, Siemens is estimating a total cost of $700,000.00 - $800,000.00 and that is the amount of our claim. This covers transportation back to Germany, repairs, and return to FP&L at Cape Canaveral, FL." Id., Ex. 4. Henry also stated that "Mr. Costa, Siemens insurance company's representative, will be inspecting the unit at Cape Canaveral on Monday, April 10, 2000. We feel [NSR] should have their representative at this inspection to protect your interests." Id.

5

According to Siemens, NSR sent a transformer consultant to conduct an investigation of the transformer.

On 18 April 2000, Henry wrote NSR and stated that it planned to ship the transformer to Germany "[u]nless [it] hear[d] differently from [NSR] within 72 hours." R2-37, Ex. L. After the transformer arrived in Germany, Henry told NSR that the transformer would be "opened for inspection" on 14 June 2000 "so if [NSR] wanted [its inspector] at this inspection he could make plans to attend." R2-37, Ex. M.

In September 2002, Siemens initiated an action against NSR in the United States District Court for the Middle District of Florida and sought $791,136 for damages to the transformer. R1-1 ¶ 11, at 3. Siemens alleged that it had timely filed a proper claim for damages with NSR prior to bringing suit. At the close of discovery, NSR moved for summary judgment on the ground that Siemens had not satisfied the condition precedent for bringing suit because it had not filed a valid claim with NSR within nine months of the damage to the transformer.

Concluding that Siemens's suit was barred, the district court granted NSR's motion. The district court stated that the ICC claims regulations[5] provide the

---

[5] In concluding that Siemens's notice of claim was insufficient, the district court relied on two paragraphs in § 1005.2: § 1005.2(b), which provides "[m]inimum filing requirements," and § 1005.2(d), which governs "[c]laims filed for uncertain amounts." As discussed subsequently, we believe that § 1005.2(d)'s prohibition of *voluntary* payment by carriers of claims for

6

applicable minimum standards for a written notice of a freight claim. Noting that, in Farmland Industries, Inc. v. Seaboard Coast Line Railroad Co., 733 F.2d 1509, 1510 (11th Cir. 1984) (per curiam), we had agreed that a main function of the notice requirement "is to allow the carrier to exactly compute its losses," the district court concluded that the Eleventh Circuit would interpret the ICC regulations strictly. The district court then determined that Siemens's letters did not satisfy the ICC regulations when strictly interpreted because they failed to make a claim for a specified or determinable amount of damages. Additionally, the district court ruled that Siemens's claim did not fall within either of the two exceptions that courts have recognized as excusing compliance with the ICC regulations. Siemens filed a timely notice of appeal.

On appeal, Siemens urges that the district court committed error in concluding that its letters to NSR did not constitute a valid claim such that it may bring suit in district court. Siemens advances two primary arguments. First, Siemens contends that the district court relied incorrectly upon 49 C.F.R. § 1005 in barring its suit for cargo damage. Siemens argues that it should not be bound by the ICC's standard because it was not explicitly included in the Bill of Lading, the USBL, the Carmack Amendment, or NSR's Conditions of Carriage, and because

uncertain amounts does not apply in this case.

7

the regulation applies only to claims that are voluntarily resolved by the carrier, as opposed to claims that are litigated. Siemens avers that we should instead assess the sufficiency of its claim under the case law in existence prior to the issuance of 49 C.F.R. § 1005. In response, NSR contends that 49 C.F.R. § 1005 should apply here because it was intended to supercede the case law on which Siemens urges we rely.

Second, Siemens argues that if the regulations do apply, the district court erred in adopting the "strict compliance" standard for assessing whether a claim satisfies the minimum requirements set forth in 49 C.F.R. § 1005.2(b). Siemens contends that the "strict compliance" cases decided by other circuits and cited by the district court are relevant only where the claim at issue fails to include an amount of damages in any form. Siemens argues that we must construe the regulation liberally in favor of the shipper because (1) doing so will serve the purpose of the regulation, which is to afford the carrier sufficient notice so that it can decide whether to investigate the claim; and (2) taking the opposite approach would derogate Siemens's common law rights by preventing it from recovering damages. Citing Farmland Industries, 733 F.2d at 1510, NSR responds that the purpose of a written claim is to allow a carrier to compute its losses exactly. NSR argues that this purpose cannot be achieved unless we require "actual compliance"

8

with 49 C.F.R. § 1005 by mandating that claims state a precise damage amount. NSR also argues that our adoption of any standard less rigorous than "actual compliance" will allow shippers to bypass the mandated uniform claims process and immediately seek a resolution in district court.[6]

## II. DISCUSSION

We review a district court's grant of summary judgment de novo, and "we view the evidence in the light most favorable to the non-moving party." Wilson v. B/E Aerospace, Inc., 376 F.3d 1079, 1085 (11th Cir. 2004). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). With this standard in mind, we review each of Siemens's arguments.

A.     Application of the ICC Regulations

The Carmack Amendment to the Interstate Commerce Act imposes liability on common carriers for the actual loss of or damage to shipments in interstate

---

[6] Siemens also contends that it should prevail even if we apply a "strict compliance" standard because (1) its claim satisfies § 1005.2 even if strictly applied; or (2) Siemens was excused from compliance with § 1005.2 because, through no fault of its own, it could not determine the exact amount of damages until more than 20 months after the delivery of the transformer. Because we reverse the district court's opinion on other grounds pressed by Siemens, we need not address these arguments.

commerce.  49 U.S.C. § 14706(a)(1).  Section (e) of the Carmack Amendment

provides that "[a] carrier may not provide by rule, contract, or otherwise, a period of

less than 9 months for filing a claim against it under this section and a period of less

than 2 years for bringing a civil action against it under this section."  49 U.S.C. §

14706(e).  Consistent with this section, the USBL requires that the shipper must

provide the carrier with a notice of claim for damages "within nine months" of

delivery of the cargo"[a]s a condition precedent to recovery."  R1-37, Ex. O § 2(b).

The standard for evaluating claims submitted pursuant to the Carmack

Amendment initially was set forth by the Supreme Court in <u>Georgia, Florida and</u>

<u>Alabama Railway Co. v. Blish Milling Co.</u>, 241 U.S. 190, 36 S. Ct. 541 (1916).[7]  In

that case, the Court stated that the purpose of a requirement in a bill of lading that

claims for damages be presented in writing within a certain time after delivery was

not to allow the carrier to avoid liability, but to "secure reasonable notice" for the

carrier.  <u>Id.</u> at 198, 36 S. Ct. at 545.  Accordingly, the Court held that such

requirements "d[id] not require documents in a particular form," so long as their

---

[7]In 1915, the Carmack Amendment was amended to allow a carrier to stipulate that a shipper must file a claim within at least four months of the damages.  <u>See</u> An Act To amend an Act entitled "An Act to amend an Act entitled 'An Act to regulate commerce,' approved February fourth, eighteen hundred and eighty-seven, and all Acts amendatory thereof, and to enlarge the powers of the Interstate Commerce Commission," approved June twenty-ninth, nineteenth hundred and six, 38 Stat. 1196, 1197 (1915).  In 1930, the proviso was amended to extend the time for filing claims to at least nine months.  <u>See</u> An Act To amend paragraph (11) of section 20 of the Interstate Commerce Act, as amended, 46 Stat. 251, 252 (1930).

purpose was served. Id. The Court also stated that the requirements "[were] addressed to a practical exigency and . . . [were] to be construed in a practical way." Id. One year later, in St. Louis, Iron Mountain, & Southern Railway Co. v. Starbird, the Court again discussed the purpose of such requirements. The Court noted that they served to "put[] in permanent form the evidence of an intention to claim damages, . . . call the attention of the carrier to the condition of the freight, and enable it to make such investigation as the facts of the case require." 243 U.S. 592, 605, 37 S. Ct. 462, 468 (1917). Courts applying the Blish Milling standard assessed liberally written claims by shippers and generally held that the claims were sufficient so long as they gave the carrier "reasonable notice" of the claim. See, e.g., Wisconsin Packing Co., v. Indiana Refrigerator Lines, Inc., 618 F.2d 441, 444 (7th Cir. 1980); Thompson v. James G. McCarrick Co., 205 F.2d 897, 901 (5th Cir. 1953) ("There is no requirement that a written instrument be submitted in detail or that the cause and exact amount of damage be stated thereon in order to constitute a valid claim.").

In 1972, the ICC responded to complaints of various abuses rampant in the settlement of claims by shippers and carriers and promulgated regulations entitled "PRINCIPLES AND PRACTICES FOR THE INVESTIGATION AND VOLUNTARY DISPOSITION OF LOSS AND DAMAGE CLAIMS AND

11

PROCESSING SALVAGE." 49 C.F.R. §§ 1005.2; see Ex. Parte No. 263: Rules, Regulations, and Practices of Regulated Carriers with Respect to the Processing of Loss and Damage Claims, 340 I.C.C. 515, 547-48 (1972) [hereinafter Ex Parte No. 263]. In creating the regulations, the ICC sought to combat carriers' attempts to discriminate among shippers in their payment of claims, to encourage prompt investigation and voluntary settlement, and to facilitate more "harmonious relationships" between carriers and claimants. Id. at 553.

Among other things, the ICC regulations provide "[m]inimum filing requirements" for a written notice of claim. Id. § 1005.2(b). According to the regulations, a written or electronic communication complies sufficiently "with the provisions for filing claims embraced in the bill of lading or other contract of carriage" if it contains "(1) . . . facts sufficient to identify the baggage or shipment (or shipments) of property, (2) [an assertion of] . . . liability for alleged loss, damage, injury, or delay, and (3) . . . [a] claim for the payment of a specified or determinable amount of money." Id. Additionally, the regulations dictate that when a claim is filed for an "uncertain amount, such as '$100 more or less,' the carrier . . . shall determine the condition of the baggage or shipment involved at the time of delivery by it, if it was delivered, and shall ascertain as nearly as possible the extent, if any, of the loss or damage for which it may be responsible." Id. §

12

1005.2(d). The carrier, however, "shall not . . . voluntarily pay a claim under such circumstances unless and until" the shipper submits a claim containing "a specified or determinable amount of money." Id.

We have not yet expressly held that the ICC's minimum claim requirements apply to litigated claims, as opposed to claims that are resolved voluntarily, but implicitly, we seem to have assumed as much. In Konst v. Florida East Coast Railway Co., we held that a claimant could invoke the presumption that a railroad carrier had received a properly mailed claim so that the claim could be considered "filed" within the meaning of 49 C.F.R. § 1005.2. 71 F.3d 850, 851-52, 855 (11th Cir. 1996). In so holding, we did not explicitly address whether § 1005 applies to contested as well as uncontested claims, but we applied the regulation without discussion and described § 1005.2 as "the federal regulations governing the minimum requirements for making a damages claim against a common carrier." Id. at 853 & n.6.

Our assumption in Konst is supported by all but one circuit to have addressed the issue. The First, Second, and Ninth Circuits have held that the regulations apply to all claims, whether contested or voluntarily settled. See Nedlloyd Lines, B.V. Corp., v. Harris Transport Co., 922 F.2d 905, 908 (1st Cir. 1991); Pathway Bellows, Inc. v. Blanchette, 630 F.2d 900, 904 (2d Cir. 1980); Insurance Co. of N. Am. v. G.

13

I. Trucking Co., 1 F.3d 903, 906 (9th Cir. 1993).  The Fifth and Sixth Circuits

applied the ICC regulations to litigated claims without explicitly ruling on the issue.

See Salzstein v. Bekins Van Lines, Inc., 993 F.2d 1187, 1188 (5th Cir. 1993);

Trepel v. Roadway Express, Inc., 194 F.3d 708, 711-12 (6th Cir. 1999).   The

Seventh Circuit, in contrast, has concluded that the ICC regulations apply only to

uncontested claims.  Wisconsin Packing, 618 F.2d at 445.  Reasoning that §

1005.2(d) prohibits carriers from voluntarily paying claims for uncertain amounts,

that the legislative proposals accompanying the ICC regulations differentiate

throughout between "'disputed claims'" and "'claims determinations,'" id. at 445,

and that "the purpose of the regulation was to make claim settlement more

expeditious by providing procedures for the voluntary disposition of claims by

carriers," id., the Seventh Circuit held that the sufficiency of a shipper's claim

should be assessed by the old Blish Milling "reasonable notice" standard, id.

After reviewing this precedent from other circuits and the contentions of the

parties, we agree with the First, Second, Fifth, Sixth, and Ninth Circuits that at least

the minimum claim requirements contained in section 1005.2(b) apply to contested

as well as voluntarily resolved claims.[8]  As stated by the First Circuit, the

---

[8] We reject the district court's conclusion that § 1005.2(d) operates here to bar Siemens's claim.  Paragraph (d) prohibits the voluntary payment of claims for uncertain amounts by carriers "unless and until a formal claim in writing for a specified or determinable amount of money [is] filed in accordance with the provisions of paragraph (b)."  49 C.F.R. § 1005.2(d).

14

regulations' section discussing the "[a]pplicability of the regulations," 49 C.F.R. §

1005.1, does not distinguish between contested and uncontested claims.  See

Nedlloyd Lines, 922 F.2d at 908.  Instead, it states that the regulations "shall govern

the processing of claims for loss, damage, injury, or delay to property transported . .

. in interstate or foreign commerce."  49 C.F.R. § 1005.1.  Similarly, in the

extensive rulemaking accompanying the regulations, the ICC clearly indicated that

its regulations should be applied broadly:

> We are persuaded by the record in this proceeding that our regulations should embrace the full range of matters relating to the filing of claims, including a prescription of minimum filing requirements and a consideration of documents that do not constitute claims, and claims for uncertain amounts . . . .
>
> . . . .
>
> Thus, the rules set fort in section 1005.1 and 1005.2 . . . first establish their overall applicability and then set out the manner and form in which loss and damage claims must be filed by claimants in order to accomplish the improvements shown to be required in the public interest in this area.

Ex Parte 263, 340 I.C.C. at 555-56.  Finally, as noted in Konst, the regulations

require carriers to fulfill certain obligations once a claim is received.  See Konst, 71

F.3d at 853.  Applying the regulations to all claims gives the carriers standards by

---

Paragraph (d) does not create a distinct standard, but rather specifies § 1005.2(b)'s claim requirements should be met before carriers voluntarily pay claims that they have investigated. Because this case does not involve a carrier's voluntary payment of a claim, § 1005.2(d) is inapplicable.

which to recognize valid claims when they receive them.  See Pathway Bellows, Inc., 630 F.2d at 904.

We find unpersuasive Siemens's argument that it should not be bound by the regulations' minimum claim requirements because they were not incorporated into the Carmack Amendment, the Bill of Lading, the USBL, or NSR's Conditions of Carriage.  As the district court noted, "[i]t is well settled that '[t]he laws in force at the time of the making of a contract enter into and form a part of the contract as if they were expressly incorporated into it.'"  National Distrib. Co. v. James B. Beam Distilling Co., 845 F.2d 307, 309 (11th Cir. 1988) (citation omitted and first alteration added).  The regulations at issue here came into effect long before Siemens agreed to a Bill of Lading from NSR.  Further, as we have explained, § 1005.2(b) applies to contested claims like Siemens's.  For these reasons, we conclude that the question of whether Siemens's letters constituted a valid claim to NSR should be determined according to § 1005.2(b)'s minimum claim requirements.

B.    Assessing Compliance with the ICC Regulations

Having concluded that the minimum claim requirements in 49 C.F.R. § 1005.2(b) govern Siemens's claim, we must now determine whether the regulation requires that a written claim specify a precise dollar amount.  Although, in

16

Farmland Industries, we agreed with the district court that "[o]ne of the principal functions of the notice requirement in the bill of lading is to allow the carrier to exactly compute its losses," 733 F.2d at 1510, we have never expressly ruled on this issue.

Federal "'[s]tatutes which invade the common law . . . are to be read with a presumption favoring the retention of long-established and familiar principles, except when a statutory purpose to the contrary is evident.'" United States v. Texas, 507 U.S. 529, 534, 113 S. Ct. 1631, 1634 (1993) (citation omitted). As explained previously, longstanding federal common law established prior to the promulgation of the ICC regulations provided that the sufficiency of claims should be judged "in a practical way" in light of the claims' purpose: securing reasonable notice for the carrier so that it can conduct an independent investigation. See Blish Milling Co., 241 U.S. at 198, 36 S. Ct. at 545; St. Louis, Iron Mountain, 243 U.S. at 605, 37 S. Ct. at 468.

We find no evidence that the ICC intended to serve a purpose radically different from this one in promulgating the regulations. See Pathway Bellows, 630 F.2d at 903 n.5. To the contrary, portions of the regulations and their accompanying source material indicate that the ICC meant to encourage carriers to investigate claims independently. See 49 C.F.R. 1005.4(a); Ex Parte No. 263, 340

17

I.C.C. at 560. Further, as the Second Circuit reasoned, the ICC regulations do not seem aimed at affording carriers an unfair opportunity to escape liability for damages that occur during shipping. The minimum claim requirements "appear to call for no more information than one ordinarily would expect a claim for damages to contain, and compliance with these requirements is neither onerous nor unreasonable." Pathway Bellows, 630 F.2d at 903 n.5. Thus, because the purpose of the regulations is consistent with longstanding common law, we interpret the minimum claim requirements with a presumption in favor of the Blish Milling common law principles. See United States v. Texas, 507 U.S. at 534, 113 S. Ct. at 1634.

Read literally, as by the district court, § 1005.2(b) could be construed to invalidate written claims that provide an estimated damages range, with minimum and maximum values, on the grounds that such a range is not "specified or determinable," 49 C.F.R. § 1005.2(b). See, e.g., Delphax Sys. v. Mayflower Transit, Inc., 54 F. Supp. 2d. 60, 64 (D. Mass. 1999) (holding that a range of $40,000 to $50,000 is not "specified or determinable"). Such a narrow construction, however, undercuts the regulation's purpose, which, as we have explained, is "not to permit the carrier to escape liability but to insure that the carrier has enough information to begin processing the claim." Trepel, 194 F.3d at

18

713. "'While it is true that the language of a statute should be interpreted according to its ordinary, contemporary and common meaning, this plain-meaning rule should not be applied to produce a result which is actually inconsistent with the policies underlying the statute.'" Bragg v. Bill Heard Chevrolet, Inc., 374 F.3d 1060, 1068 (11th Cir. 2004) (citation omitted) (noting this rule and applying it to the interpretation of a regulation). We thus reject the district court's construction.

Keeping in mind the purpose of the ICC regulations and the Supreme Court's admonishment that we should interpret statutes and regulations in light of their common-law backdrop, we construe 49 C.F.R. § 1005.2(b) liberally and conclude that Siemens's notice of claim, which specified a damages range of $700,000 to $800,000, satisfies the minimum claim requirements. Siemens's letters constituted a written notice of damage with a clearly communicated intent to hold NSR liable. Additionally, the letters indicated that Siemens's claim would be significant and gave NSR more than enough information to begin an investigation, which NSR in fact did in sending its expert to inspect the transformer in Florida. Finally, the range specified by Siemens included a minimum and maximum amount, unlike "$100 more or less," 49 C.F.R. § 1005.2(d), and the actual amount of damages it claimed in court fell within that range.

We find unpersuasive all of NSR's arguments to the contrary. First, we reject

19

NSR's contention that the majority of circuit courts to have addressed the issue have required "actual compliance" with the "specified and determinable amount" provision so as to bar Siemens's claim here, see Appellee's Brief at 13, 23. In all of the circuit court cases that NSR cites, our sister circuits have addressed situations in which the shipper provided the carrier with no damage amount at all. In Salzstein, the Fifth Circuit held that a notice which did not specify any damage amount did not suffice. 993 F.2d at 1189, 1190-91. In Nedlloyd Lines, the First Circuit ruled that letters that "in [no] way specified the amount of money claimed" fell short of 49 C.F.R. § 1005(b)'s requirements. 922 F.2d at 908. Similarly, in Pathway Bellows, the Second Circuit deemed insufficient a claim that did not include an amount of damages or assert that the carrier was liable. 630 F.2d at 901, 903, 904 (assessing a letter which stated "[a]lthough we have contacted your company earlier, the purpose of this letter is to state, in writing, that we are in the process of filing a claim for freight damage of a shipment"). Accordingly, these cases do not stand for the proposition that the shipper must strictly comply with the regulation by providing a single, certain damage amount.

On the other hand, two circuits have held that an estimate of damage was sufficient in part because the carriers had begun to investigate the claims. In Insurance Company of North America, the Ninth Circuit adopted a "substantial

20

compliance" standard and held that a written notice of damage which "clearly communicated intent to hold [the carrier] liable" was sufficient under the regulations, even though it only estimated the amount of damages. 1 F.3d at 904, 907 & n.3. In <u>Trepel</u>, the Sixth Circuit concluded that the purpose of the claim regulation is to "insure that the carrier has enough information to begin processing the claim" and found that a claim for an amount of damage "'to be determined but not to exceed $150,000.00 '" substantially complied. 194 F.3d at 712, 713. Not only do we find this reasoning more compelling, we also believe that the factual circumstances at issue in these cases are more analogous here than those addressed in <u>Salzstein</u>, <u>Nedlloyd</u>, or <u>Pathway Bellows</u>.[9]

Second, we do not read <u>Farmland Industries</u> to establish a rule that a claim is not valid unless it includes an exact amount of damages. We did not address in that case whether a claim is sufficient if it includes a damages range rather than a single amount. Instead, based on the particular factual circumstances presented, we declined to apply a rule that a shipper could be excused from filing a claim within

---

[9] We are mindful that at least two district courts have applied <u>Nedlloyd</u> or <u>Pathway Bellows</u> to hold that a claim which includes a damages estimate, rather than a single, certain damage amount, falls short of § 1005.2(b)'s "specified or determinable" amount requirement. See <u>Delphax Sys.</u>, 54 F. Supp. 2d at 64; <u>Bobst Div. of Bobst Champlain, Inc. v. IML-Freight Inc.</u>, 556 F. Supp. 665, 668-69 (S.D.N.Y. 1983) (holding that a claim which estimated damages at $100,000 was neither specified nor determinable). Not only are district courts persuasive authority only, <u>see</u> <u>Dow Jones & Co, Inc. v. Kaye</u>, 256 F.3d 1251, 1258 n.10 (11th Cir. 2001), but also we reject the district court's conclusions in these cases for the same reasons, discussed previously, for which we reverse the district court here.

21

the prescribed nine-month period if the carrier had obtained "'actual knowledge'" of all information that a claim would have provided. 733 F.2d at 1510. Moreover, our agreement with the district court that a "principal function[] of the notice requirement in the bill of lading is to allow the carrier to exactly compute its losses," id., is consistent with our conclusion here. When a shipper provides a carrier with a relatively narrow range of damages, the carrier is afforded the opportunity to investigate the claim and may "exactly" compute a damages amount. As Siemens argues, any carrier faced with a large claim would be neglectful of its duties if it simply paid a large claim without making any independent efforts to verify the shipper's estimate.

Finally, we disagree with NSR's assertion that our decision to view § 1005.2(b) liberally in light of its purpose will allow shippers to bypass the mandated claims process by asking a court to determine whether a carrier should pay a claim that was not presented properly in the first place. As the Ninth Circuit explained, "[w]e fail to see why shippers will be eager to circumvent the notice requirements, avoid voluntary settlement, and embark upon expensive, time-consuming litigation to recover their damages." Insurance Co. of N.A., 1 F.3d at 907 n.4.

Because, in this case, Siemens indicated its intent to hold NSR liable, gave

22

NSR multiple opportunities to inspect the transformer, and provided a damages range with a minimum and maximum amount in which its claim ultimately fell, we consider Siemens's claim sufficient under 49 C.F.R. § 1005.2(b) even though Siemens did not specify a single, certain damages amount. Therefore, we reverse the decision of the district court and remand for proceedings consistent with this opinion.

### III. CONCLUSION

In this appeal, we determined whether a notice of claim submitted by Siemens to NSR regarding damage to an electrical transformer shipped in January 2000 satisfied the minimum claim filing requirements in 49 C.F.R. § 1005, a regulation promulgated by the ICC. The district court found that Siemens's claim was not sufficient because, in stating that its transformer suffered damages somewhere in the range of $700,000 to $800,000, it did not state a "specified or determinable" amount as required by § 1005.2(b). First, we hold that the district court correctly stated that § 1005.2(b) applies to litigated as well as uncontested claims, and it governs Siemens's claim here. Second, we conclude that the district court erred in determining that Siemens's claim was not valid. Because we construe § 1005.2(b) liberally in view of its purpose, which is to secure reasonable notice for the carrier so that it may conduct an independent investigation of a shipper's claim,

23

we hold that Siemens's claim met the requirements of § 1005.2(b) as a matter of law. Accordingly, we **REVERSE** and **REMAND** for proceedings consistent with this opinion.