**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

**No. 04-2383**

---

ALSTOM POWER, INCORPORATED, a Delaware
corporation,

Plaintiff - Appellee,

versus

NORFOLK SOUTHERN RAILWAY COMPANY, an entity
operating in Maryland,

Defendant - Appellant.

---

Appeal from the United States District Court for the District of
Maryland, at Baltimore. Benson Everett Legg, Chief District Judge.
(CA-01-622-1-BEL)

---

Argued: September 20, 2005        Decided: November 17, 2005

---

Before WIDENER and TRAXLER, Circuit Judges, and R. Bryan HARWELL,
United States District Judge for the District of South Carolina,
sitting by designation.

---

Affirmed by unpublished per curiam opinion.

---

**ARGUED:** Paul D. Keenan, Jonathan F. Ball, JANSSEN, KEENAN & CIARDI,
P.C., Philadelphia, Pennsylvania, for Appellant. Karyn Alicia
Booth, THOMPSON HINE, L.L.P., Washington, D.C., for Appellee. **ON
BRIEF:** Scott A. Harvey, THOMPSON HINE, L.L.P., Washington, D.C.,
for Appellee.

————————

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

PER CURIAM:

Norfolk Southern Railway Company ("Norfolk Southern") appeals various findings of fact and conclusions of law entered by the district court following a bench trial in an action brought by Alstom Power, Inc. ("Alstom") under the Carmack Amendment to the Interstate Commerce Act. See 49 U.S.C.A. § 11706 (West 1997). For the reasons that follow, we affirm.

I.

Alstom designs, fabricates and supplies components for heat recovery steam generators ("HRS generators") used in electric power plants. In July 1998, Alstom entered into a five-year contract to supply HRS generators to Duke/Fluor Daniel, Inc. ("DFD"), the general contractor for the construction of power plants in Hidalgo, Texas, and Veazie, Maine. The contract imposed various delivery deadlines for the HRS generator components to arrive at the DFD construction sites. The contract included a liquidated damages provision that was triggered by a missed delivery date. The amount of liquidated damages due under this provision increased proportionally with the length of the delay.

Alstom fabricates the components for its HRS generators--steel modules and steam drums—-at plants in Kings Mountain, North Carolina, and Chattanooga, Tennessee. The tremendous weight of the

3

components generally requires Alstom to ship them by rail. In the fall of 1998, Alstom's Manager of Transportation, Gregory Gowans, arranged for the shipment of the HRS generator components to DFD's construction site at Veazie with Norfolk Southern, the only rail carrier that serviced Alstom's North Carolina and Tennessee plants. In explaining Alstom's shipping requirements for the DFD contract, Gowans informed Norfolk Southern that Alstom's planning was predicated upon an expected transit time of seven to fourteen days, and that the final deadline for the delivery of the modules to Veazie was June 30, 1999, pursuant to Alstom's contract with DFD. Gowans also informed upper-level managers from Norfolk Southern that late delivery would give DFD the right to seek liquidated damages from Alstom.

In May 1999, Alstom began delivering modules to Norfolk Southern for shipment. Each module was shipped under a separate Uniform Bill of Lading requiring Norfolk Southern to transport the shipments with "reasonable dispatch." The "reasonable dispatch" period was not defined. Ultimately, twenty-six out of thirty steel modules being shipped to Veazie arrived after the June 30 deadline. Both parties contributed to the delays: Norfolk Southern's actual transit time ranged from 29-62 days, and Alstom experienced manufacturing problems that contributed to the delay of certain shipments. At some point during the summer of 1999, when it was

4

apparent that Alstom would have difficulty meeting the delivery deadlines, Gowans secured premium transportation services for some of the shipments, including special trains to transport only Alstom's modules and weekend inspections at transfer points.

In September 1999, Alstom and DFD began negotiating DFD's claim for damages as a result of the untimely deliveries. Initially, DFD sought liquidated damages under the contract of more than ten million dollars--$5.08 million attributable to the late deliveries to Veazie and the remainder attributable to late deliveries to DFD's Hidalgo, Texas, construction site. Eventually, however, DFD relented on its demand for liquidated damages and indicated that it would settle for actual damages caused by the delayed deliveries, provided that a settlement could be reached quickly and without haggling.

The parties ultimately reached a settlement based on DFD's unilateral calculation of actual damages. Mike Stark, a former DFD employee who negotiated the settlement terms with Alstom, testified that on November 15, 1999, DFD presented its calculation of actual damages to Alstom and explained the general basis for the claim. However, in light of DFD's right to pursue liquidated damages under the contract, DFD "made it quite clear . . . that [DFD] had no contractual obligation to give [Alstom] . . . information" about

5

how DFD arrived at an actual damages figure or to "prove that this was right or wrong." J.A. 1638.

Concluding that DFD's calculations were accurate and reasonable under the circumstances—-indeed, they were much less than the liquidated damages originally sought by DFD--Alstom's negotiators accepted DFD's settlement offer without requiring an accounting or itemization of the alleged actual damages. The final settlement figure was $3.6 million, covering damages incurred by DFD at both the Veazie and Hidalgo sites. The $3.6 million amount consisted of $1.8 million in cash and $1.8 million in extended warranties.

On December 22, 1999, the parties confirmed the essential terms of the settlement agreement in a two-page document (the "Term Sheet"). The Term Sheet purported to "serve as the basis for a negotiated settlement agreement between [DFD] and [Alstom] for Liquidated Damages arising from delayed deliveries for the Maine Independence Project . . . and for Hidalgo Energy Project." J.A. 2906. The Term Sheet set forth the amount of the cash payment, explained Alstom's extended warranty obligations, and indicated that the settlement covered all past and present claims relating to delays at the Veazie and Hidalgo construction sites. The Term Sheet, however, did not apportion settlement between the Veazie and Hidalgo sites, and it did not distinguish between damages resulting

6

from Alstom's own manufacturing delays and those caused by Norfolk Southern's transit issues. The Term Sheet also reflected the parties' agreement "to reduce these terms to a settlement agreement for signature as soon as possible after the holidays." J.A. 2907. There is no evidence, however, that the parties subsequently executed a formal settlement agreement. According to John Stratton, an Alstom employee who participated in the negotiation process, the parties honored the Term Sheet even though no formal agreement was prepared or signed after the holidays.

On March 6, 2000, Alstom's attorney submitted an eleven-page letter to Norfolk Southern asserting a claim under the Carmack Amendment for damages caused by the late deliveries to the Veazie site. Neither this letter nor the subsequent lawsuit sought indemnification for damages paid by Alstom in connection with the Hidalgo site. Although the letter incorrectly indicated that, pursuant to its contract with DFD, Alstom had already paid $1,695,000 in liquidated damages, it acknowledged that Alstom's production problems contributed to the delays and thus demanded reimbursement from Norfolk Southern in the amount of $930,000—-less than the full amount. Alstom's claim also included $203,276 in premium freight charges that Alstom paid for substitute rail service incurred "[a]s a direct result of [Norfolk Southern's] failure to provide timely service to Veazie." J.A. 2916. In the

7

claim letter, Alstom offered to disclose to Norfolk Southern "confidential contract provisions" and other relevant documents upon the execution of a confidentiality agreement. J.A. 2908. Norfolk Southern, which was undergoing a merger with another rail carrier, indicated it would respond to the claim as soon as possible. Although Alstom sent additional letters in April and September 2000, Norfolk Southern failed to respond.

On March 2, 2001, Alstom filed this action, seeking to recover damages for the late deliveries to Veazie under the Carmack Amendment.[1] Following the completion of discovery, Alstom moved for partial summary judgment, seeking a ruling that Norfolk Southern, as a matter of law, "violated its statutory obligation under the Carmack Amendment to transport Alstom's modules with reasonable dispatch." J.A. 848. The parties agreed that, in order to rule on this issue, the district court would first need to determine the reasonable dispatch period for these shipments, the point at which the reasonable dispatch period begins to run, and the actual delivery time. Even accepting Norfolk Southern's evidence as true, the court determined that thirty-one of thirty-two modules were not delivered with reasonable dispatch. The

---

[1]Alstom also included claims for (1) breach of the bills of lading, (2) breach of the duty of good faith and fair dealing, and (3) breach of contract. The district court dismissed the first two claims and Norfolk Southern was awarded summary judgment on the third.

district court concluded that it would be for the finder of fact at trial to decide whether the remaining module was delivered with reasonable dispatch.

Norfolk Southern filed a cross-motion for summary judgment, contending that Alstom offered insufficient evidence that Norfolk Southern, regardless of whether it delivered with reasonable dispatch, caused any of the damages claimed by Alstom. Specifically, Norfolk Southern argued that because the modules at the time of delivery were missing parts due to manufacturing problems, Norfolk Southern's failure to deliver with reasonable dispatch did not cause Alstom to violate its delivery deadlines. Norfolk Southern also argued that it was not liable for any portion of the unallocated settlement because the apportionment of damages rested on speculation. Finally, Norfolk Southern contended that it was not liable for the premium rail services procured by Alstom. The district court concluded that a triable issue of fact existed as to all three issues and denied the motion.

In November 2003, the district court conducted a four-day bench trial and reached the following conclusions. First, the court rejected Norfolk Southern's argument that Alstom failed to file a valid notice of claim under the Carmack Amendment—-a prerequisite for imposing liability upon a rail carrier-—because Alstom's March 6, 2000, letter did not claim a "specified or

9

determinable amount of money." 49 C.F.R. 1005.2(b). The district court concluded that the letter satisfied the claim requirement. The court reasoned that "[a] Carmack Amendment claim is not intended to serve as an itemized statement of account that the carrier is expected to pay by return mail. Instead, the claim triggers the carrier's obligation to investigate it promptly upon receipt." J.A. 3214.

Next, the district court considered whether Norfolk Southern delivered with reasonable dispatch the remaining module, an issue left for trial following the court's summary judgment ruling. The court found that the reasonable dispatch period for regular train service in this case was fourteen days, a factual determination that fell comfortably between the range of reasonableness suggested by the parties' witnesses-—Alstom took the position that the reasonable transit time was between seven and fourteen days, and Norfolk Southern estimated between sixteen and twenty days. With respect to special trains that charge a premium rate, the court found that a reasonable dispatch period of seven days was appropriate. The district court also determined, contrary to the position taken by Norfolk Southern, that the reasonable dispatch period should be measured from the time that a rail carrier issues a waybill signifying the shipment has been inspected and is approved for transit, not the time that the carrier actually begins

"pulling" the shipment.  Finally, applying these findings, the court concluded that the last of the thirty-two modules was delivered beyond the reasonable dispatch period in violation of the Carmack Amendment.

As for causation, the district court concluded that Norfolk Southern's late deliveries caused actual harm even though many of the modules arrived at Veazie without pressure nozzles because of production problems at the Alstom plants. The court found that the missing nozzles did not impede the construction schedule because the nozzles were not needed until shortly before the power plant began operating.

The district court rejected Norfolk Southern's argument that it was not liable for the premium freight charges paid by Alstom because Alstom's manufacturing problems would have required the hiring of these special trains in any event.  The court reasoned that Gowan's decision to secure an alternate carrier—-before there was any indication of a manufacturing problem--was a reasonable response to the fact that there were transit delays for even the earliest shipments.  The district court found, therefore, that "Gowans would have engaged these services regardless of Alstom's manufacturing problems."  J.A. 3226.

Finally, the district court concluded that, before it could determine the damages owed by Norfolk Southern for its untimely

11

deliveries, it was required to identify the portion of the settlement between Alstom and DFD that was attributable to delays at Veazie, not Hidalgo; to identify the portion of the settlement paid for the late delivery of modules, as opposed to other parts arriving late; to determine a dollar value for the extended warranties portion of the settlement; and to "determine the share attributable to Norfolk [Southern]'s transit delays (rather than Alstom's manufacturing delays)."  J.A. 3226.

Based on the testimony of Mike Stark, a former DFD employee who participated in negotiating the settlement, the district court concluded that sixty-three percent of the settlement amount was attributable to delays at Veazie.  The court further found that the entire settlement amount was based on the late delivery of modules as opposed to other parts and equipment.  Furthermore, the district court credited the testimony of John Stratton, Alstom's project director for generators, that it would cost Alstom $700,000 to honor the extended warranty portion of the settlement.  Finally, the district court recognized that Norfolk Southern was not solely at fault for the late deliveries, given that Alstom failed to have some of the modules ready for shipping until after the June 30 deadline.  Accordingly, the court arrived at the following formula for calculating damages:  "$1.575 million multiplied by the

12

percentage of total delay attributable to Norfolk [Southern], plus the cost of premium transportation services." J.A. 3255.

The district court invited Alstom to submit a proposed final damages figure using this formula and to brief the court on the propriety of pre-judgment interest. The district court likewise invited a response from Norfolk Southern. Alstom submitted a final figure of $1,459,485, including interest. The court reduced the interest claimed by Alstom but otherwise adopted Alstom's calculation and entered judgment in the amount of $1,230,871.[2]

II.

A.

Norfolk Southern argues that Alstom failed to file a proper written notice of claim and was therefore precluded from bringing suit on its delay claim under the Carmack Amendment. Like the district court, we reject this claim.

The Carmack Amendment to the Interstate Commerce Act imposes liability upon a rail carrier "for the actual loss or injury to the property" it transports under a bill of lading. 49 U.S.C.A. § 11706(a); see Siemens Power Transmission & Distrib., Inc. v. Norfolk Southern Ry. Co., 420 F.3d 1243, 1248 (11th Cir. 2005). A bill of lading is essentially "a transportation contract between a

---

[2]On appeal, Norfolk Southern does not specifically challenge the award of prejudgment interest.

13

shipper/consignor (i.e., a seller of goods) and a carrier." Paper Magic Group, Inc. v. J.B. Hunt Transport, Inc., 318 F.3d 458, 461 (3d Cir. 2003). Although the statute refers to "loss or injury" to the property being shipped, the Carmack Amendment allows a shipper to recover damages caused by the carrier's unreasonable delay in transporting the shipment. See New York, Philadelphia & Norfolk R.R. Co. v. Peninsula Produce Exch. of Md., 240 U.S. 34, 38-39 (1916); Hector Martinez & Co. v. Southern Pac. Transp. Co., 606 F.2d 106, 108 (5th Cir. 1979).

The uniform bill of lading issued by all rail carriers obligates carriers to transport shipments with "reasonable dispatch." 49 C.F.R. 1035, App. B, § 2(a) (2004). The terms of the uniform bill of lading also require that, "[a]s a condition precedent to recovery, claims must be filed in writing with the receiving or delivering carrier, or carrier issuing this bill of lading, or carrier on whose line the loss, damage, injury or delay occurred, within nine months after delivery of the property." 49 C.F.R. 1035, App. B, § 2(b). This language comports with the statutory directive that shippers be afforded no less than nine months to file a claim with the carrier and no less than two years to file a civil action. See 49 U.S.C.A. § 11706(e).

The Department of Transportation has prescribed various baseline requirements for a shipper's claim. See 49 C.F.R.

14

1005.2(b).  The claim must be in writing, it must be submitted within the time limits set by the bill of lading, and it must: "(1) [c]ontain[] facts sufficient to identify the . . . shipment . . . , (2) assert[] liability for alleged loss, damage, injury, or delay, and (3) mak[e] claim for the payment of a specified or determinable amount of money."  Id.

The primary purpose of the pre-suit claim requirement is to "secur[e] reasonable notice for the carrier so that it can conduct an independent investigation."  Siemens Power, 420 F.3d at 1251. The purpose of the regulation is "not to permit the carrier to escape liability but to insure that the carrier has enough information to begin processing the claim."  Id. at 1252 (internal quotation marks omitted).  Thus, a specific amount is not required; the claim must communicate the intent to hold the carrier liable and provide sufficient information for the carrier to investigate the claim.  See id.

Based on these general principles, Norfolk Southern argues that "where a carrier denies a proper timely filed freight claim, any subsequent suit against the carrier essentially asks the courts to review the propriety of the carrier's denial."  Brief of Appellant at 19.  Thus, Norfolk Southern argues that the court should decide only whether the carrier should have paid the precise claim presented to it.  Norfolk Southern contends that Alstom's

15

letter of March 6, 2000, sets forth a different claim than the one that actually went to trial and, therefore, failed to satisfy the "specific or determinable amount of money" requirement prescribed by regulation. Alstom's claim incorrectly asserted that it had already paid liquidated damages of $1,695,000. Acknowledging that production problems contributed to the delays, Alstom made a demand for $930,000, in addition to $203,276 for the premium rail services that it secured to mitigate the delays. The total amount of the delay claim was just over $1.1 million. Norfolk Southern points out, however, that Alstom increased the amount of its claim after suit was filed and changed the basis for its claim from liquidated to actual damages.

We agree with the district court that the March 6, 2000, letter gave plenty of information to permit Norfolk Southern to begin its investigation. The fact that the letter misstated the basis for determining the amount of its claim--the liquidated damages clause as opposed to the negotiated settlement of DFD's actual damages—-did not prevent it from satisfying the claim requirement. As the district court observed, the regulations do not require "an itemized statement of account that the carrier is expected to pay by return mail." J.A. 3214.

Norfolk Southern's complaint boils down to its belief that Alstom's claim for damages presented in the March 6 letter morphed

16

into something different at trial. Norfolk Southern cannot win this argument, however, by hyper-technical reliance on regulations designed to afford it an opportunity to investigate the claim when Norfolk Southern in fact conducted absolutely no investigation of the claim and made no decision on the claim before this action was filed. See 49 C.F.R. § 1005.4 (2004) (requiring carriers to investigate claims promptly); 49 C.F.R. § 1005.5 (2004) (directing carriers to "pay, decline, or make a firm compromise settlement offer" within 120 days after receiving the claim). Accordingly, we reject this argument.[3]

## B.

Norfolk Southern next argues that the district court's allocation of the settlement between Veazie and Hidalgo cannot be affirmed because it was based on speculative and inadmissible evidence. First, Norfolk Southern contends that the district court should not have permitted any testimony regarding how the settlement was allocated in light of Alstom's failure to produce a

---

[3]We likewise reject Norfolk Southern's argument that the judgment should be vacated because the district court quashed the trial subpoena issued to the attorney who drafted the November 6 claim letter that wrongly indicated Alstom paid liquidated damages. Even assuming such testimony would not have divulged privileged information, we fail to see the relevance of testimony regarding how the statement about liquidated damages "came to be made." Brief of Appellant at 48. It is undisputed that this assertion was false, and that Alstom and DFD did not reach a settlement using liquidated damages.

17

formal settlement agreement between Alstom and DFD. According to Norfolk Southern, any testimony about how the settlement was allocated was barred by the best evidence rule. Norfolk Southern also argues that Alstom's failure to produce a formal settlement document suggests spoliation of the evidence.

The district court found that "[o]n December 22, 1999, Alstom and DFD memorialized the main points of the settlement in . . . (the 'Term Sheet')" and that "[t]he parties intended to prepare a formal settlement agreement after the winter holidays, <u>but never did so</u>." J.A. 3210 (emphasis added). The court concluded that the "Term Sheet . . . is the sole contemporaneous writing that describes the settlement." <u>Id.</u> Norfolk Southern's arguments assume the opposite--that the parties created a formal, integrated settlement document. However, Norfolk Southern has not highlighted any record evidence that would convince us that the factual findings of the district court in this regard were clearly erroneous. Accordingly, we reject Norfolk Southern's argument that the district court erred in considering testimony regarding the terms of the settlement.[4]

---

[4]Norfolk Southern also contends that the parol evidence rule bars testimony regarding the allocation of settlement funds because "[i]t is also possible that the Settlement Agreement was silent as to allocation, but contained a merger clause." Brief of Appellant at 29. This argument injects speculation into an argument already based on the unsupported assumption that a formal settlement document existed. We reject this theory as well.

18

Next, Norfolk Southern argues that the testimony relied upon by the district court to support its allocation determination was too speculative to have been considered. The primary negotiators for Alstom and DFD testified at trial about the delay damages linked to the Veazie site as opposed to the damages attributed to the Hidalgo site. Norfolk Southern characterizes this testimony as post hoc allocation of damages, supplying the settlement with terms the parties never agreed upon or considered. The witnesses, however, testified that the allocation of damages between Veazie and Hidalgo was, in fact, considered at the time of settlement even though the Term Sheet did not itemize the components of the settlement. We conclude that there is sufficient evidence to support the district court's finding that the parties allocated delay damages between the two sites in reaching a settlement.

Finally, Norfolk Southern contends that the deposition testimony of witnesses from Alstom and DFD was inconsistent as to what percentage of the lump sum settlement had been allocated to the Veazie site, thus demonstrating the unreliable and speculative nature of the allocation evidence. Specifically, Thomas DeHart, a DFD employee involved in the settlement negotiations, indicated that approximately forty-four percent was apportioned to Veazie, while Alstom's Stratton indicated that the settlement was split evenly between the two sites. Both of these witnesses, however,

19

were explaining how the settlement was apportioned for accounting purposes, not for purposes of determining actual damages. Ultimately, the district court accepted the trial testimony of Mike Stark, a former employee with DFD with no ties to Alstom, who indicated, based on his contemporaneous notes, that sixty-three percent of the settlement was apportioned for actual damages at Veazie. We conclude that this evidence was sufficiently certain and non-speculative to permit the court to make its findings.[5]

## C.

Finally, Norfolk Southern argues that the district court abdicated its role as a fact-finder when it directed Alstom to submit a proposed final judgment using the liquidated damages formula that Alstom disavowed earlier in the litigation. We cannot agree. Although Norfolk Southern is correct that we have "consistently disapproved of the practice of a district court adopting proposed findings of fact and conclusions of law submitted by the prevailing party," District 17, United Mine Workers of America v. Apogee Coal Co., 13 F.3d 134, 137 n.4 (4th Cir. 1993), this is not such a case. The district court made its own detailed

---

[5]Norfolk Southern also challenges the district court's finding that Alstom is entitled to recover the premium transportation costs it incurred. This argument simply takes issue with the district court's view of the evidence. Finding no clear error, we reject this argument as well.

findings of fact, including the formula for determining damages, and arrived at its own conclusions of law. The district court's order merely directed Alstom to perform a calculation based on the court's factual determination. Part of the calculation called for a determination of the number of "delay days" attributable to Norfolk Southern, but the court invited both sides to submit briefs on this narrow issue. Moreover, the district court did not use the "contractual liquidated damages" provision, as Norfolk Southern contends. Indeed, the district court specifically found that DFD waived the liquidated damages clause and settled its losses with Alstom based on actual damages. The formula devised by the court did not change this finding.

## III.

For the foregoing reasons, we affirm the district court.

AFFIRMED