# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued December 12, 2019      Decided August 11, 2020

No. 18-7177

KEITH ALLEN, ET AL.,
APPELLEES

v.

DISTRICT OF COLUMBIA, A MUNICIPAL CORPORATION,
APPELLANT

Consolidated with 18-7178

Appeals from the United States District Court
for the District of Columbia
(No. 1:00-cv-00591)

*Richard S. Love*, Senior Assistant Attorney General, Office of the Attorney General for the District of Columbia, argued the cause for appellant. With him on the briefs were *Karl A. Racine*, Attorney General, *Loren L. AliKhan*, Solicitor General, and *Caroline S. Van Zile*, Deputy Solicitor General.

*Michael J. Murali* argued the cause for appellees. On the brief was *Ronald L. Drake*.

Before: SRINIVASAN, *Chief Judge*, and GRIFFITH and KATSAS, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* KATSAS.

KATSAS, *Circuit Judge*:  In 2009, Congress enacted an appropriations rider prohibiting the District of Columbia from paying more than $4,000 in attorneys' fees for any past proceeding under the Individuals with Disabilities Education Act (IDEA).  These appeals present the question whether the District must pay interest on amounts that exceed the payment cap.  They also present various challenges to the cap itself.

I

A

The IDEA provides federal funds to States and the District of Columbia to educate children with disabilities.  20 U.S.C. §§ 1401(31), 1411(a)(1).  In exchange, recipients must offer a free appropriate public education to all eligible children.  *Id.* § 1412(a)(1).  Parents alleging that their child's education falls short of this standard are entitled to an administrative hearing, *id.* § 1415(b)(6), (f), at which they have a "right to be accompanied and advised by counsel," *id.* § 1415(h)(1).  Parents aggrieved by a hearing officer's decision may seek review in a civil action.  *Id.* § 1415(i)(2).  Courts may "award reasonable attorneys' fees" to parents who prevail in the administrative hearing or the lawsuit.  *Id.* § 1415(i)(3)(B)(i); *see Moore v. District of Columbia*, 907 F.2d 165, 167 (D.C. Cir. 1990) (en banc).

The District of Columbia has long struggled to comply with the IDEA.  By 1998, the District's failures had "reached crisis proportions." *Calloway v. District of Columbia*, 216 F.3d 1, 3 (D.C. Cir. 2000) (cleaned up).  This led to a flurry of successful IDEA challenges, which in turn led to mounting awards of attorneys' fees. In 1998, the District was paying over $10 million per year in IDEA attorneys' fees, and Congress

grew concerned that these payments were diverting resources from the D.C. public schools. *See id.* at 4.

Congress responded by passing a series of appropriations riders limiting the amount that the District could pay in IDEA attorneys' fees. For 1999, 2000, and 2001, Congress capped the amount per proceeding that the District could pay out of current appropriations. District of Columbia Appropriations Act, 2001, Pub. L. No. 106-522, § 122(a), 114 Stat. 2440, 2464 (2000); District of Columbia Appropriations Act, 2000, Pub. L. No. 106-113, § 129(a), 113 Stat. 1501, 1517 (1999); Omnibus Consolidated and Emergency Supplemental Appropriations Act, 1999, Pub. L. No. 105-277, § 130, 112 Stat. 2681, 2681-138 (1998). For 2002, Congress provided that no current or future appropriations for the District could be used to pay past IDEA attorneys' fees that exceeded caps in place when the work was performed. District of Columbia Appropriations Act, 2002, Pub. L. No. 107-96, § 140(a), 115 Stat. 923, 958 (2001) (2002 Act).

For 2003 to 2008, Congress passed annual riders prohibiting the District from paying more than $4,000 per proceeding out of current appropriations for IDEA attorneys' fees. Consolidated Appropriations Act, 2008, Pub. L. No. 110-161, § 819(a), 121 Stat. 1844, 2040 (2007); Revised Continuing Appropriations Resolution, 2007, Pub. L. No. 110-5, § 101(a)(9), 121 Stat. 8, 9; Transportation, Treasury, Housing and Urban Development, the Judiciary, the District of Columbia, and Independent Agencies Appropriations Act, 2006, Pub. L. No. 109-115, § 122, 119 Stat. 2396, 2519 (2005); District of Columbia Appropriations Act, 2005, Pub. L. No. 108-335, § 327(1), 118 Stat. 1322, 1344 (2004); Consolidated Appropriations Act, 2004, Pub. L. No. 108-199, § 432(1), 118 Stat. 3, 141; Consolidated Appropriations Resolution, 2003, Pub. L. No. 108-7, § 144(1), 117 Stat. 11, 131–32.

For 2009, Congress passed a final appropriations rider. Like the 2002 Act, it applied to current and future appropriations. It provides that no funds appropriated for the District "may be made available … to pay the fees of an attorney who represents a party in or defends an IDEA proceeding which was initiated prior to the date of the enactment of this Act in an amount in excess of $4,000 for that proceeding." Omnibus Appropriations Act, 2009, Pub. L. No. 111-8, § 814(a)(1), 123 Stat. 524, 697 (2009 Act).

B

In these eleven consolidated cases, the plaintiffs are hundreds of parents who prevailed against the District in IDEA proceedings initiated before the 2009 Act was enacted. They were awarded attorneys' fees at various times between 2001 and 2009. The District has refused to pay fees that exceed the current cap of $4,000 per proceeding.

In 2015, the plaintiffs moved to compel the District to pay the balance of their attorneys' fees with interest. The district court held that the 2009 Act applies to all the plaintiffs' IDEA proceedings. *See Allen v. District of Columbia*, 128 F. Supp. 3d 74, 81–82 (D.D.C. 2015) (*Allen I*). The court further held that the payment cap does not violate the separation of powers, the Takings Clause, or the Equal Protection Clause. *Id.* at 83–84. The court referred the matter to a magistrate judge to determine the amounts due in each of the cases. *Id.* at 85.

The magistrate judge separately calculated how much the District owed and how much it could lawfully pay. He determined that the District owed a total of about $3.7 million in fee awards, which had accumulated over $1.3 million in interest. Applying the payment cap, the magistrate judge recommended that the District be required to pay about

$514,000 in fee awards and costs.  He did not recommend that the District be required to pay any interest.

Both sides filed objections to the magistrate judge's report and recommendation.  The plaintiffs objected to its failure to include interest; the District did not mention that issue.  While the dispute was pending before the district court, the District paid the plaintiffs some $427,000, which it characterized as including all undisputed fees plus interest on those fees.  The district court prodded the parties to clarify their exact positions on and calculation of interest. The plaintiffs then asserted that the District should be required to pay interest on the full amount of fee awards, not just on amounts up to the payment cap.  The District responded that it could not be compelled to pay interest on debts that it was legally forbidden to pay off.

The district court agreed with the plaintiffs.  It held that the District's position was both forfeited and meritless.  *Allen v. District of Columbia*, 263 F. Supp. 3d 14, 32–33 (D.D.C. 2017) (*Allen II*).  After modifying the magistrate judge's calculations, the court ordered the District to pay some $220,000 in further outstanding fee awards, as limited by the payment cap, and about $1.4 million in interest accumulated on the entire amount of all unpaid awards. *See id.* at 46.

## II

The District raises only one contention on appeal: that it cannot be compelled to pay interest on fee awards that Congress has prohibited it from paying.

## A

The district court held that the District forfeited this argument by not raising it under the court's Local Rule 72.3(b).

That rule requires a party to file written objections to a magistrate judge's report and recommendation within 14 days.

The District did not forfeit the interest issue. Because the magistrate judge did not recommend requiring it to pay any interest, much less interest on the full fee awards, the District had no reason to object on that basis. Nor was the question otherwise fairly teed up. To the contrary, before referring the matter to the magistrate judge, the district court ruled that the District "must pay plaintiffs $4,000—less any amount already paid—plus interest, for each action." J.A. 216. This formulation at least suggested that interest would be due only on amounts up to the $4,000 cap. The court also instructed the magistrate judge "to calculate the amount of interest due from the date of judgment until October 1, 2015, so that any further statutory change authorizing additional payments in the outstanding judgments will be readily actionable." *Allen I*, 128 F. Supp. 3d at 85. This further suggested that the District would pay interest on the full awards only if Congress lifted the fee cap. In turn, the magistrate judge separately determined the "amount of fees and costs due now pursuant to the $4,000 fee cap"—with no provision for interest—and the "amount of the remaining judgment with interest" calculated on the entire fee awards. J.A. 268 (cleaned up). Finally, the magistrate judge's proposed orders would have required the District to pay only the outstanding below-cap fees, plus costs, with no interest.

The District did not need to object to something that the magistrate judge had not recommended. Neither the court's instructions to the magistrate judge nor the magistrate judge's report and recommendation fairly warned that the District might be required to pay interest on the full fee awards. And as soon as the district court raised that possibility, the District promptly objected, thus preserving the issue.

B

On the merits, the District contends that the 2009 fee cap prohibits it from paying interest on the full judgment amounts. We review this question of law de novo. *See Conservation Force v. Salazar*, 699 F.3d 538, 542 (D.C. Cir. 2012).

The plaintiffs' argument is straightforward: By its terms, the 2009 Act prohibits the use of any appropriated funds to pay more than $4,000 per IDEA proceeding for "the fees of an attorney." Pub. L. No. 111-8, § 814(a)(1), 123 Stat. at 697. But without exception, another statute provides that "[i]nterest shall be allowed on any money judgment in a civil case recovered in a district court." 28 U.S.C. § 1961(a). And "any money judgment" includes an award of attorneys' fees. *Akinseye v. District of Columbia*, 339 F.3d 970, 972 (D.C. Cir. 2003). Thus, the 2009 Act prohibits payment of certain *fees*, yet section 1961(a) nonetheless requires payment of *interest* on those fees. The argument is beguilingly simple, but it overlooks an important background principle.

The Supreme Court has explained that, "where a common-law principle is well established, … courts may take it as a given that Congress has legislated with an expectation that the principle will apply except when a statutory purpose to the contrary is evident." *Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104, 108 (1991) (cleaned up). "In order to abrogate a common-law principle, the statute must 'speak directly' to the question addressed by the common law." *United States v. Texas*, 507 U.S. 529, 534 (1993) (quoting *Mobil Oil Corp. v. Higginbotham*, 436 U.S. 618, 625 (1978)). The Court repeatedly has applied this principle to narrow the scope of seemingly unbounded statutes. For example, although the Patent Act provides a patentee with the textually unqualified right to exclude others from his invention, the

Supreme Court has recognized an "unwritten limit"—that the patentee loses this right upon sale of the invention—based on the common law's "antipathy toward restraints on alienation." *Impression Prods., Inc. v. Lexmark Int'l*, 137 S. Ct. 1523, 1531, 1536 (2017). In construing statutory causes of action, the Court has invoked common-law principles to impose causation requirements that do not appear in the governing text. *See*, *e.g.*, *Comcast Corp. v. NAACP*, 140 S. Ct. 1009, 1014–17 (2020) (42 U.S.C. § 1981); *Holmes v. SIPC*, 503 U.S. 258, 265–68 (1992) (civil RICO); *Associated Gen. Contractors of CA v. California State Council of Carpenters*, 459 U.S. 519, 529–35 (1983) (Clayton Act). And although criminal statutes often seem to impose strict liability, the Court, invoking background principles, does not "construe mere omission from a criminal enactment of any mention of criminal intent as dispensing with it." *Morissette v. United States*, 342 U.S. 246, 250 (1952).

This case implicates another well-established common-law principle: If the law makes a debt unpayable, then interest on the debt is also unpayable. This rule flows from the meaning of interest, which is "given on money demands as damages for delay in payment." *Redfield v. Ystalyfera Iron Co.*, 110 U.S. 174, 176 (1884); *see also Library of Congress v. Shaw*, 478 U.S. 310, 322 (1986) (interest is "designed to compensate for the belated receipt of money"); *Shoemaker v. United States*, 147 U.S. 282, 321 (1893) ("Interest accrues … in the nature of damages, by reason of the failure of the debtor to pay the principal when due."). When Congress has prohibited a monetary payment, its delayed receipt is not *wrongful*; instead, it is *obligatory*. And a party cannot fairly be made to pay "damages" for doing what the law requires.

This principle is as old as the Republic. As far back as 1789, the Supreme Court held that an American debtor owed no interest to a British creditor for the time between September

1775 and March 1783, when the Continental Congress had made it illegal to "make any remittances" to British subjects. *Hoare v. Allen*, 2 U.S. (2 Dall.) 102, 103 (1789). The Court explained that "[w]here a person is prevented by law, from paying the principal, he shall not be compelled to pay interest during the prohibition." *Id.* This followed from the nature of interest: "Interest is paid for the use or forbearance of money. But in the case before us, there could be no forbearance; because the plaintiff could not enforce the payment of the principal; nor could the defendants pay [the plaintiff], consistent with law …." *Id.* The Court later applied the same rule in *Brown v. Hiatts*, 82 U.S. (15 Wall.) 177 (1872), which arose from legislation prohibiting certain payments during the Civil War. The Court gave the same explanation: "Interest is the compensation allowed by law, or fixed by the parties, for the use or forbearance of money, or as damages for its detention, and it would be manifestly unjust to exact such compensation, or damages, when the payment of the principal debt was interdicted." *Id.* at 185. The Court stated that "[a]s a general rule it may be safely laid down that wherever the law prohibits the payment of the principal, interest during the existence of the prohibition is not demandable." *Id.* at 186 (cleaned up).

We have no basis to conclude that section 1961(a) abrogated this background rule. Judgments are normally enforceable, so a statute providing for interest on judgments does not "speak directly," *United States v. Texas*, 507 U.S. at 534, to specific cases where Congress has prohibited their payment. To be sure, section 1961(a) provides for interest on "any" district-court judgment. But "generic terms like 'any' or 'every' do not rebut" settled background rules. *Kiobel v. Royal Dutch Petroleum Co.*, 569 U.S. 108, 118 (2013). For example, given the background presumption against extraterritoriality, a statute covering "any civil action" does not sweep in civil

actions based on acts committed abroad. *See id.* And given the background presumption that a crime requires bad intent, a statute reaching "any communication containing any threat … to injure" does not sweep in threats made through negligence. *Elonis v. United States*, 135 S. Ct. 2001, 2009–11 (2015). Likewise, a statute providing for interest on "any" judgment does not abrogate the background rule governing interest on debts for which Congress has prohibited payment.

The specific context of the 2009 Act reinforces this conclusion. Recall that by 1998 the District was paying over $10 million annually to IDEA attorneys, which prompted Congress to adopt eleven different appropriations riders culminating in the 2009 Act. The obvious purpose of these riders was to limit the amount that the District pays to IDEA attorneys. But requiring payment of interest on fee awards that the District was prohibited from paying would have precisely the opposite effect. Over time, that would force the District to pay *more* to IDEA attorneys than it would have had to pay without the cap. Indeed, the plaintiffs' position would convert a permanent payment cap imposed on the District into a permanent annuity for IDEA attorneys. We should not "lightly conclude" that Congress enacted such a "self-defeating statute." *Quarles v. United States*, 139 S. Ct. 1872, 1879 (2019); *see also* A. Scalia & B. Garner, *Reading Law: The Interpretation of Legal Texts* 63 (2012). Of course, we must be careful in invoking statutory purposes to depart from seemingly clear statutory text. But here, a relevant background rule has operated for centuries, and we need only read the governing statute in light of that rule.

The district court and the plaintiffs offer various responses to the *Brown* line of cases, but none is persuasive. The district court asserted that here, unlike in those cases, payment of the principal "was never suspended." *Allen II*, 263 F. Supp. 3d at

33. That is incorrect; Congress has prohibited payment of fee awards over $4,000 in individual IDEA proceedings for over two decades. For their part, the plaintiffs contend that *Brown* is distinguishable because these cases do not involve a war. But *Brown*, like *Hoare* before it, turned squarely on the nature of interest, not the nature of war. *See* 82 U.S. at 186 ("As a general rule it may be safely laid down that wherever the law prohibits the payment of the principal, interest during the existence of the prohibition is not demandable."). Finally, the plaintiffs contend that section 1961(a) has superseded the *Brown* line of cases. They are mistaken. As explained above, these cases establish a firm background common-law rule, which section 1961(a) does not speak clearly to abrogate.

For these reasons, we hold that the District cannot be compelled to pay interest on the portion of fee awards that it has been legally prohibited from paying off.

### III

On cross-appeal, the plaintiffs argue that the 2009 fee cap does not apply at all to most of the fee awards at issue. They further raise separation of powers and takings challenges to the cap. And they contend that the cap breaches the District's duty of good faith and fair dealing. We review these legal arguments de novo. *See Conservation Force*, 699 F.3d at 542.

### A

We begin with the plaintiffs' statutory arguments. First, the plaintiffs invoke the presumption against statutory retroactivity, *see Landgraf v. USI Film Prods.*, 511 U.S. 244 (1994), to contend that the 2009 Act should not be applied to their fee awards. But the statute does speak clearly to its own temporal scope; by its terms, it applies to fees in IDEA

proceedings "initiated prior to the date of the enactment of this Act." Pub. L. No. 111-8, § 814(a)(1), 123 Stat. at 697.

Next, the plaintiffs argue that the 2009 Act, which is an appropriations statute, should not be construed to modify substantive law. Insofar as the plaintiffs suggest that the funding restrictions in the 2009 Act do not govern future appropriations, they again overlook clear statutory text. By its terms, the 2009 Act restricts use of "the funds contained in this Act or in any other Act making appropriations for the government of the District of Columbia for fiscal year 2009 or any succeeding fiscal year." Pub. L. No. 111-8, § 814(a), 123 Stat. at 697. Moreover, we have held that the 2002 Act, which was similarly worded in this respect, applied to current and future appropriations. *See Whatley v. District of Columbia*, 447 F.3d 814, 820 (D.C. Cir. 2006).

The plaintiffs briefly suggest that the payment cap applies only to federally appropriated funds and thus does not prohibit use of the District's other revenue sources to pay off the fee awards. But the plaintiffs fail to identify any such sources or otherwise to develop this theory beyond bald assertion. We do not consider arguments raised in such skeletal form. *Schneider v. Kissinger*, 412 F.3d 190, 200 n.1 (D.C. Cir. 2005). In any event, in construing the 2002 Act, we took it for granted that a prohibition on the District's ability to spend federally appropriated funds amounts to a blanket spending prohibition. *See Whatley*, 447 F.3d at 819–20 ("the District is *never* to pay fees for work done or fees requested in the relevant years").

B

We next consider the plaintiffs' constitutional challenges to the fee cap. First, the plaintiffs contend that the cap violates the separation of powers by commanding the courts to reopen final judgments, which is unconstitutional under *Plaut v.*

13

*Spendthrift Farm, Inc.*, 514 U.S. 211 (1995). But the 2009 Act does no such thing. Instead, it limits the future use of funds to "pay" for attorneys' fees in IDEA proceedings initiated prior to its enactment. Pub. L. No. 111-8, § 814(a)(1), 123 Stat. at 697. As we explained in construing the 1999 appropriations rider, such a statute does not prevent the entry of future judgments. *See Calloway*, 216 F.3d at 18–19. Nor does it retroactively "reverse" past final judgments. *See Plaut*, 514 U.S. at 225.

The plaintiffs further contend that the 2009 Act violates the separation of powers by purporting to bind future Congresses. The 2009 Act does continue to govern current and future appropriations, but nothing in it prevents (or could prevent) a future Congress from lifting its payment restrictions. As we explained in *Whatley*, barring "payment in subsequent fiscal years" is different from purporting to bar subsequent statutory amendments. 447 F.3d at 821–22 (cleaned up).

Finally, the plaintiffs argue that the fee cap violates the Takings Clause of the Fifth Amendment, which prohibits "private property" from being "taken for public use, without just compensation." But the 2009 Act did not effect a *per se* taking, because it neither appropriated nor physically invaded the plaintiffs' fee awards. *See Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 537 (2005). Nor does the 2009 Act effect a regulatory taking, which turns on the economic impact of the challenged regulation, its interference with reasonable investment-backed expectations, and its character. *Penn Cent. Transp. Co. v. New York City*, 438 U.S. 104, 124 (1978). Here, the economic impact of the fee cap is limited, as the plaintiffs still may recover attorneys' fees of $4,000 per proceeding plus costs and interest on that amount. Moreover, the fee cap does not interfere with any reasonable expectations, for each of the awards at issue was entered at a time when Congress had already limited the District's ability to pay IDEA fee awards.

14

Far from upsetting the status quo, the 2009 Act merely carried it forward. Finally, the fee cap involves the allocation of scarce public resources—a kind of government action unlikely to amount to a taking.

C

The plaintiffs argue that the District breached a duty of good faith and fair dealing when it lobbied for the fee cap while negotiating consent judgments in two of the cases under review. The plaintiffs failed to raise this argument before the district court, so we do not consider it. *See Keepseagle v. Perdue*, 856 F.3d 1039, 1053 (D.C. Cir. 2017).

IV

For these reasons, we reverse the district court's judgment requiring payment of interest on above-cap fees, affirm the district court's judgment in all other respects, and remand for further proceedings consistent with this opinion.

*So ordered.*